**EXHIBIT 4**

**JAMS ARBITRATION**
**Benson Everett Legg, JAMS Arbitrator**

| | |
|---|---|
| AZOD, ARMIN, | * |
| SHARMA, SHANTANU, | * |
| ZHANG, DONG, | * |
| JOHN, PETER, | * |
| and | * |
| ELGAMMAL, RAMEZ | * |
| Claimants/Counter Respondents, | * |
| v. | * |
| ROBINSON, JAMES G., | * JAMS Reference No.: 1415013632 |
| MORGAN CREEK PRODUCTIONS, INC., | * |
| CECELIA, LLC, | * |
| and | * |
| GOOD STUFF, LLC | * |
| Respondents/Counter-Claimants. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

**PARTIAL FINAL AWARD (Corrected)**

**PROCEDURAL HISTORY**

**Claimants' Demand**

Claimants/Counter-Respondents ("Claimants" or "Azod Parties") are Armin Azod, Shantanu Sharma, Dong Zhang, Peter John, and Ramez Elgammal.   On September 1, 2016, Claimants initiated this arbitration by filing a Demand for Arbitration supported by a 29-page

1

Statement Supporting Claims.[1] Claimants asked for a judgment against Respondents on the following claims:

(i) breach of contract,

(ii) fraud,

(iii) declaratory judgment that Respondents committed fraud/inequitable conduct against the USPTO,

(iv) an award of compensatory damages, and

(v) an award of punitive damages, attorneys' fees, and costs.

**Respondents' Second Amended Response and Counter-Claims**

Respondents/Counter-Claimants ("Respondents" or "Robinson Parties") are James G. Robinson, Morgan Creek Productions, Inc., Cecelia, LLC, and Good Stuff, LLC. On October 6, 2017, Respondents filed a Second Amended Response and Counter-Claims. The response denied the Azod Parties' claims and pressed six (6) counter-claims:

1. Rescission Based on Fraud

2. Rescission Based on Breach of Contract

3. Breach of Contract

4. Breach of Implied Covenant of Good Faith and Fair Dealing

5. Fraud: Intentional Misrepresentation, Negligent Misrepresentation, Promissory Fraud and Concealment.

6. Breach of Fiduciary Duty

---

[1] Prior to this arbitration, Claimants filed suit against Respondents in the United States District Court for the Central District of California. The case was docketed as *Armin Azod, et. al. v. James G. Robinson, et. al.,* Case No.: 21:16-cv-00440 – JFW (Ex) (Filed January 20, 2016).

**The Arbitrator's Rule 18 Decision**

Following discovery, the parties filed motions for summary disposition under Rule 18 of the JAMS Comprehensive Arbitration Rules and Procedures.[2]  I heard the motions during a day-long hearing on July 27, 2018.  I decided the motions in an order dated September 24, 2018.  I will now identify the claims I disposed of and those that proceeded to the merits hearing.

**The Robinson Parties' Fraud Claim Proceeded to the Merits Hearing**

Recognizing that material facts are in dispute, the Robinson Parties did not move for summary disposition of their central fraud claim that Mr. Robinson was the target of a scam. They summarized their fraud claim as follows:

> Unbeknownst to Mr. Robinson, he had been the target of a fairly sophisticated scam. Claimants led Mr. Robinson to believe that Novoform had developed the "ground-breaking" technology of a single-step methane to methanol conversion.  Claimants represented to Mr. Robinson that this "technology" was worth billions.  But this was deception on a grand scale.[3]

**Two of the Robinson Parties' Breach of Contract Claims Proceeded to the Merits Hearing.**

<u>First Claim</u>:  **That Claimants Failed to Disclose (i) Negative Test Data and Results, and (ii) PCT '178.**

<u>Second Claim</u>: **That Claimants Failed to Transfer All of the Acquired Assets.**

The Robinson Parties moved for summary disposition on two alleged breaches by the Azod Parties of the Asset Purchase Agreement ("APA").

---

[2] In accordance with the choice of law provision of the Asset Purchase Agreement, Maryland law governs the dispute.

[3] Respondents' Motion for Summary Disposition, p. 2 (internal citations omitted).

**First Claimed Breach**

The first breach is based on Section 9(f), in which Claimants warranted that, "to the best of their knowledge" they were unaware of "any facts, events, or circumstances relating specifically to Novoform or the Acquired Assets which may have a material adverse impact on Novoform or the Acquired Assets, their business prospects or financial condition."[4]

The Robinson Parties point to two categories of adverse information that Claimants allegedly failed to disclose to them. The first includes testing data that, they say, called the performance of the Novoform catalyst into question. The second includes Dr. Elgammal's earlier patent application for a catalyst (PCT '178) that they contend is prior art that should have been disclosed to them and to the USPTO.

I decided that the Robinson Parties' first breach of contract claim (negative test data and PCT'178) was not susceptible to resolution on summary disposition. Section 9(f) includes language that requires a nuanced factual inquiry into the knowledge and thought processes of the parties to the APA as well as the significance of the information. Section 9(f) includes the phrases, "to the best of their knowledge," "is not aware of," and "material adverse impact." Moreover, Claimants maintain that the Robinson Parties and their attorneys were aware of the testing results and PCT '178 at the time the APA was signed. Hence, a dispute of material facts existed, precluding a grant of summary disposition.[5]

---

[4] Section 9(f) reads as follows: "To the best of their knowledge, Novoform and each Member is not aware of any facts, events, or circumstances relating specifically to Novoform or the Acquired Assets which may have a material adverse impact on Novoform or the Acquired Assets, their business prospects or financial condition."

[5] Moreover, the materiality of the information must be measured against Section 9 (p.5) of the APA, which provides, "EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PARAGRAPH 9, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND" concerning the validity of the patent rights. I ruled that the import of this exception to the warranty clause must be explored legally and factually at the merits hearing.

**Second Claimed Breach**

The Robinson Parties claimed a second breach, namely that Claimants breached the APA

by failing to transfer all acquired assets.  Claimants, they contend, were required to convey to

them on the October 15, 2014 closing date all information, materials, and data related to the

acquired technology.  Claimants failed to transfer the acquired assets, the Robinson Parties

allege.  The APA, paragraph 2 is titled, **Agreement to Purchase.**  It provides:

> At the Closing, Cecilia will purchase or otherwise acquire Novoform and all
> interests in Novoform, which the Parties agree will entitle Cecilia to full, total and
> complete ownership, control and dominion over the Acquired Assets and all other
> assets of Novoform.  Cecilia shall purchase the Acquired Assets from Seller, upon and
> subject to the terms and conditions of this Agreement and in exchange for delivery of
> the Purchase Price…to Seller.

The term, "Acquired Assets" is defined in Exhibit A to the APA as including:

> 1. All Membership interests in Novoform Technologies, LLC.

> 2.  All assets owned by or controlled by Novoform Technologies, LLC.

> 3.  Any patent applications and patents with claims issuing in any country
> claiming priority to PCT Application No. PCT/US2014/056111, filed on September 17,
> 2014 (the "PCT Application").

The Robinson Parties maintain that Claimants withheld documents containing

Novoform's trade secrets, including proprietary research and testing information.  In particular,

Respondents contend that Claimants withheld the synthesis protocol, a critical trade secret that

constitutes the recipe for synthesizing the Novoform catalyst.  Respondents' Motion for

Summary Disposition, pp. 14-15.

Claimants counter that they provided all material information to Mr. Robinson and his

team pursuant to a Non-Disclosure Agreement ("NDA") that predates the APA, which was

signed on October 15, 2014.  They assert that Dr. Elgammal sent the protocol by email to Dr.

Dean Fanelli, Mr. Robinson's patent attorney, on August 4, 2014.  They aver that the Robinson

Parties knew they kept copies of the protocols and test results and were using them

appropriately to continue developing the Novoform technology with Argonne National

Laboratory.  Because material facts were in dispute, I ruled that this second breach of contract

claim was not susceptible to resolution by a Rule 18 motion.

**Claimants' "Offensive" Rule 18 Motion for Breach of Contract by Failure to Pay Sums Due Under the APA.**

Claimants filed a Motion for Partial Summary Disposition of Breach of Contract Claims

(Claimant's so-called "Offensive Motion").  *Inter alia.* they contended the APA is an enforceable

contract that unequivocally requires the Robinson Parties to pay Claimants $921,886, which

remains unpaid.  This sum includes the Second and Third Purchase Price Payments, various

unpaid expense reimbursements, and unpaid Sponsored Research payments.  Claimants

requested me to grant summary disposition as to Respondents' contractual obligation to pay

these sums.

In opposition, Respondents argued that their duty to pay amounts due under the APA

was excused by Claimants' material breaches.[6] Claimants, they contend, breached the APA by,

*inter alia.,* falsely representing that they were unaware of unfavorable testing data and results,

by failing to disclose the importance of Dr. Elgammal's prior patent application (PCT' 178), and

by failing to convey all Acquired Assets to the Robinson Parties.  Respondents also maintained

---

[6] Respondents' legal proposition is correct.  "[A] party who commits the first breach of contract, if material, is not entitled to enforce the contract and thereby excuses the nonbreaching party from performance."  *Va. Elec. & Power Co. v. Bransen Energy Inc.,* 850 F.3d 645, 655 (4th Cir. 2017).

that Claimants procured the APA by fraudulently misrepresenting the efficacy of the Novoform technology, thereby voiding their obligation to pay.

It was uncontested that the Robinson Parties refused to pay amounts otherwise due under the APA.  What remained undecided, I ruled, was the factual dispute over whether Claimants' misconduct excused the payments.  Hence, I declined to grant summary disposition to the Azod Parties on this claim.

**Joint Stipulation of November 13, 2018**

Prior to the hearing, the parties agreed to stipulate to certain payments due under the APA if I ruled that the contract is valid and has not been materially breached by Claimants.  The parties filed their stipulation on November 13, 2018 after the hearing ended.  As part of the Stipulation, Claimants dropped their damage claim for lost profits and royalties.  "If the Arbitrator rules that the Asset Purchase Agreement is a valid contract, Respondents agree that they shall pay royalties to Claimants for any future profits derived from the Novoform assets, including PCT '111.  Royalties shall be payable under the same terms set forth in the Asset Purchase Agreement, and those terms shall apply to Respondents and any assigns, transferees, or successors in interest."

Although Claimants dropped their claim for damages based on royalties and lost profits, the parties agreed, "Claimants shall still be entitled to seek damages under the Asset Purchase Agreement for scheduled payments, and sponsored research, plus interest and fees, and attorneys' fees and costs for the arbitration."

The parties jointly stipulated that that "the following payments [due under the APA] were not made:"

1. Second Purchase Price payments due to Claimants on September 30, 2015 in the total amount of $300,000.

2. Third Purchase Price payments due to Claimants on December 31, 2015 in the total amount of $500,000.

3. Second Expense Reimbursement payment due to Mr. Azod on September 30, 2015 in the amount of $28,443; and

4. Third Expense Reimbursement payment due to Mr. Azod on December 31, 2015 in the amount of $28,443.

The stipulation concerning royalties made it unnecessary for me to hear the Azod Parties' claim that Respondents breached the APA (i) by failing to prosecute Patent Application PCT '111, (ii) by failing to take steps to commercialize the technology, and (iii) by assigning two Novoform Patent Applications (PCT '111 and PCT '624) from Cecilia, LLC to Good Stuff, LLC without Claimants' consent.[7]

The stipulation left unresolved a number of issues.  First, Claimants asserted their breach of contract claim against all Respondents.  The only party to the APA on the purchaser's side, however, is Cecilia, LLC.  The liability of Mr. Robinson and Morgan Creek for breach of contract damages other than for potential lost profits and royalties was left open.  Second, Claimants' breach of contract claim encompasses monetary relief other than the four payments specified.  The requested relief includes, *inter alia,* fees due to Dr. Zhang, the cost of the arbitration, and attorneys' fees.

---

[7] PCT '624 involved a methane-to-hydrogen process.

**Claimants' Claim that the Robinson Parties Defrauded Them**

At the Rule 18 stage, I dismissed the Azod Parties' fraud claim against the Robinson Defendants. Claimants contended that Mr. Robinson entered into the APA with a specific, premeditated plan to steal their technology without paying for it. I found there was insufficient evidence upon which a reasonable finder of fact could conclude that Mr. Robinson intended, as of October 15, 2014, to steal the technology by entering into a contract that he never intended to honor.

**Joint List of Elements**

At my request, the parties, on October 30, 2018, submitted a joint list of the elements of the claims to be heard at the merits hearing. Quoted *verbatim* (citations omitted) they are:

**Breach of Contract Elements:**

To prevail in an action for breach of contract, a Claimant/Counter-Claimant must prove that:

1. Respondent/Counter Respondents owed the Claimant/Counter-Claimant a contractual obligation and

2. That the Respondent/Counter-Respondents materially breached that obligation.

3. A breach is material if it affects the purpose of the contract in an important or vital way.

**First Material Breach:**

1. "A material failure of performance by on party prevents performance of the other party's remaining duties from becoming due, at least temporarily, and it discharges those duties if it has not been cured during the time in which performance can occur."

**Waiver:**

A party can modify or waive contractual provisions despite a provision purporting to limit those abilities. Even where a material breach of a contract has occurred, the nonbreaching part may waive any claim of materiality through its actions.

**Fraudulent Inducement**

To prevail in an action for fraudulent inducement, Respondents must prove each of the following by clear and convincing evidence:

1. Claimants made a false representation to Respondents;

2. The falsity of the representation was either known to Claimants or the representation was made with reckless indifference to its truth;

3. The misrepresentation was made for the purpose of defrauding Respondents;

4. Respondents reasonably relied on the misrepresentation and had the right to rely on it; and

5. Respondents suffered compensable injury as a result of the misrepresentation.

**Fraudulent Concealment:**

To prevail in an action for fraudulent concealment, Respondents must prove each of the following by clear and convincing evidence:

1. Claimants owed a duty to Respondents to disclose a material fact;

2. Claimants failed to disclose that fact;

3. Claimants intended to defraud or deceive the Respondents;

4. Justifiably relying on the concealment, Respondents took action; and

5. Respondents suffered damage from Claimants' concealment.

## THE MERITS HEARING

### Participants

The hearing took place at the JAMS Resolution Center in Los Angeles, California from November 6-10, 2018.  The following individuals participated.

Representing Claimants:  Amanda Fleming, Esquire, Aaron Perez-Daple, Esquire, and Alfredo Perez de Alejo, Esquire.

Representing Respondents:  Fred D. Heather, Esquire, Justin Thiele, Esquire, and Ms. Autumn McIntosh.

Court Reporter:  Ms. Jeanine Curcione

### The Witnesses

### Witnesses called by Claimants:

Claimant, Ramez Elgammal, the Ph.D. chemist and inventor who filed the PCT '111 Application for the methane-to-methanol catalyst that lies at the heart of the Asset Purchase Agreement.[8]

Claimant, Armin Azod, a patent attorney and businessman who interested Mr. Robinson in purchasing and commercializing the methane-to-methanol catalyst embodied in the PCT '111 Application.  Mr. Azod represented Novoform and the other claimants in connection with the Asset Purchase Agreement.[9]

Claimant, Dong Zhang, a Ph.D. chemist who assisted Dr. Elgammal in testing the methane-to-methanol catalyst at CSULA.  After the APA was signed, Dr. Zhang continued working on the catalyst in conjunction with Argonne National Laboratory.[10]

Dr. Andreas Roelofs, a Ph.D. Chemist, who is currently the Director of the Center for Integrated Nano Technologies at the Los Alamos National Laboratory.  From September

---

[8] Dr. Elgammal has an undergraduate degree in Chemistry and Biology from Central Michigan University, master's degrees in Applied Physics and Physics from Cal Tech as well as a Ph.D. in Chemistry from Cal Tech.  He currently works at the University of Tennessee and consults for a company named the Coretec Group.

[9] Mr. Azod has an undergraduate degree, but not a doctoral degree, in Chemistry.  He studied German Literature and Chemistry at UCLA.  He received his JD from Pepperdine Law School.  He passed the patent bar exam.

[10] Dr. Zhang received his Ph.D. in Organic Chemistry from the Chinese Academy of Science, Beijing.

2011 to 2017, he worked at the Argonne National Laboratory as, variously, Deputy Director and Acting Director of the Nano Center.

**Witnesses called by Respondents:**

Dr. Dean Fanelli, a Ph.D. chemist and patent attorney who drafted the Asset Purchase Agreement and represented the Robinson Parties (including performing due diligence) in their purchase of the PCT '111 technology.

Respondents' expert witness, Dr. Jay Labinger, a Ph.D. Chemist who opined as to the inefficacy of the methane-to-methanol catalyst embodied in the PCT '111 Application and the futility of attempting to commercialize the technology.[11]

Mr. James Robinson, the successful, self-made businessman and entrepreneur whose company acquired Novoform and its technology.  Mr. Robinson owns and controls Cecilia, LLC and Good Stuff, LLC.  Mr. Robinson has no background in chemistry or patent law.

**The Questions to be Decided**

1.   Did Claimants fraudulently induce James G. Robinson to enter into the Asset Purchase Agreement?

2.   Did Claimants fraudulently conceal a material fact or facts from James G. Robinson, who, in justifiable reliance on the concealment, entered into the Asset Purchase Agreement?

3.   Did Claimants materially breach Section 9(f) of the Asset Purchase Agreement by failing to disclose negative testing results of which they were aware prior to the signing of the contract?

4.   Did Claimants materially breach Section 9(f) of the Asset Purchase Agreement by failing to disclose the existence of PCT '178 prior to the signing of the contract?

5.   Did Claimants materially breach section 9(f) by failing to disclose or misrepresenting the anticipated cost of developing the Novoform catalyst?

6.   Did Claimants materially breach Section 7 (Seller Deliveries at Closing) of the Asset Purchase Agreement by failing to deliver at closing "all assets owned by or

---

[11] Dr. Labinger received his Ph.D. in Organic Chemistry at Harvard University. Currently, he is Administrator of the Beckman Institute at Cal Tech.  During his career, he held two industrial positions; one At Occidental Petroleum, the other at Atlantic Richfield.  In both, he worked in the field of catalysts.  While at Cal Tech, he has worked in a joint program converting methane to methanol using solid homogenous catalysts.

controlled by Novoform Technologies, LLC", including protocols, testing results, and other trade secrets?

7. Is the APA a valid contract binding on Respondents?

**RESPONDENTS' GENERAL CONTENTIONS[12]**

This section outlines the contentions Mr. Heather made in his opening statement,

Respondents contend that Mr. Azod sold Mr. Robinson a worthless technology, knowing it was

worthless.[13] Echoes of Mr. Azod's sales pitch hyping Novoform's catalyst reverberate in

paragraph 13 of the Arbitration Demand, which breathlessly contends: "[f]or the past four

years, Claimants have diligently and earnestly sought to revolutionize the oil and gas industry

by developing and bringing to market groundbreaking chemical-manufacturing technology that

would provide tremendous energy-savings to the industry."

> Specifically, this potentially revolutionary technology allows for the conversion of methane gas to methanol using novel catalysts. These proprietary catalysts allow for a conversion of methane to methanol that is an estimated 30 to 40 percent more energy-efficient than current processes. Methanol is an extremely valuable chemical feed stock, and the annual market for methanol is estimated at $30 billion. Accordingly, this technology could conservatively be valued in the billions of dollars based on the energy savings it can achieve. Additionally, data from Argonne National Laboratory ("Argonne"), operated by the University of Chicago for the United States Department of Energy, shows that this technology can produce hydrogen gas from methane, a result which may have enormous economic and social value.[14]

There is nothing ground-breaking about the technology. Science has for decades known

about catalysts capable of producing methanol from methane in a single step.[15] These catalysts

---

[12] Conceptually, it is logical to view this case as a fraud, breach of contract case brought by the Robinson Parties against the Azod parties. Mr. Heather's opening statement can be found at Tr. 110618, pp. 7-16.

[13] *See* Mr. Heather's opening statement. Tr. 110618PD, pp. 7, *et. seq.*

[14] Claimants' Demand for Arbitration, paragraph 13.

[15] Commercially, methanol is converted from methane in a two-step process. Scientists have long sought a more efficient single step process, a holy grail that would make the inventor wealthy.

have never been harnessed commercially because they require an excessive amount of energy to work, and they produce only a small volume of methanol.  The Novoform catalysts could never be developed commercially because it either did not work or worked only feebly.  Prior to the signing of the APA, Dr. Elgammal tested his catalysts at Cal State Los Angeles.  Some tests were unable to measure any yield; other tests measured only a paltry yield. None of these tests gave promise that the technology could ever be commercialized.[16] Mr. Azod peddled this worthless technology to Mr. Robinson, who lacks a science background, by falsely representing that it was groundbreaking.

Respondents recognize that the APA (Section 9(g)) contains "No Warranties" and "Limitation of Liability" clauses.  These clauses do not vitiate their fraud claims because the APA was fraudulently induced.

These clauses also do not vitiate Respondents' breach of contract claims.  Two of these claims center on Section 9, which reads: "To the best of their knowledge, Novoform and each Member is not aware of any facts, events, or circumstances relating specifically to Novoform or the Acquired Assets which may have a material adverse impact on Novoform or the Acquired Assets, their business prospects or financial condition."   Claimants breached this representation by (i) failing to disclose the negative results achieved by the catalyst during the Cal State Los Angeles tests, and (ii) failing to disclose PCT '178.  The third claim centers on Section 7 (Seller Deliverables at Closing), which Claimants violated by failing to turn over at

---

[16] Respondents contend that a second set of tests at Argonne, conducted after the APA was in place using a more sophisticated machine, also produced a miniscule, commercially unpromising yield of methanol.

closing all protocols, test results, catalysts, and other items that constitute the trade secrets of

Novoform."

Section 7 provides:

**Seller Deliverables at Closing.**  At the Closing, and subject to the terms and conditions
herein contained, Seller shall deliver to Cecilia the following:

(a)  such bills of sale with covenants of warranty, assignments, endorsements, and other
good and sufficient instruments and documents of conveyance and transfer, in form
reasonably satisfactory to Cecilia, as shall be necessary and effective to transfer and
assign to, and vest in, Cecilia all of Seller's right, title and interest in and to the
Acquired Assets;

(b)  all necessary consents and approvals of all persons, entities and governmental
agencies and authorities required to sell and transfer the Acquired Assets free of
Liens and consummate the transactions described in and contemplated by this
Agreement with respect to the Acquired Assets; and

(c)  such other documents and instruments as may be reasonably requested by Cecilia,
and its counsel in connection with Seller's performance of its covenants, duties, and
obligations described in this Agreement.

## CLAIMANTS' GENERAL CONTENTIONS

As outlined in Mr. Perez-Daple's opening statement, Novoform was formed in 2012 to

develop a catalyst that could convert methane to methanol in a single step.[17]  When Mr. Azod

interested Mr. Robinson in Novoform, the technology had proof of concept, but was

commercially unproven.  Claimants never represented that they possessed the so-called, "holy

grail," a commercially scalable catalyst.  Had they possessed such a catalyst, they never would

have sold it for a mere million dollars.

Mr. Azod and Mr. Robinson discussed the risks and the cost of developing the Novoform

technology well before the APA was signed.  Mr. Robinson was represented by three attorneys,

---

[17] *See* Mr. Perez Daple's opening statement.  Tr. 110618PD, pp. 1-7.

Dr. Fanelli, Bayan Laird, and Drew Wheeler. Consistent with the catalyst's status as unproven, early-stage technology, Section 9 of the APA disclaims all warranties concerning the patent rights being conveyed:

> **No Warranties.** EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PARAGRAPH 9, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, CONCERNING THE PATENT RIGHTS GRANTED HEREUNDER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, VALIDITY OF PATENT RIGHTS, CLAIMS, WHETHER ISSUED OR PENDING, AND THE ABSENCE OF LATENT OR OTHER DEFECTS, WHETHER OR NOT DISCOVERABLE, AND HEREBY DISCLAIMS THE SAME. SPECIFICALLY, AND NOT TO LIMIT THE FOREGOING, SELLER MAKES NO WARRANTY OR REPRESENTATION (i) REGARDING THE VALIDITY OR SCOPE OF ANY OF THE CLAIM(S), WHETHER ISSUED OR PENDING, OF ANY OF THE PATENT RIGHTS, AND (ii) THAT THE EXPLOITATION OF THE PATENT OR ANY OF THE PATENT RIGHTS OR ANY PRODUCT OR PROCESS WILL NOT INFRINGE ANY PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF ANY THIRD PARTY.

> **Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS BE LIABLE TO THE OTHER PARTY OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND AGENTS FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE LICENSE GRANTED HEREUNDER, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, INCLUDING WITHOUT LIMITATION ECONOMIC DAMAGES OR INJURY TO PROPERTY OR LOST PROFITS, REGARDLESS OF WHETHER EITHER PARTY SHALL BE ADVISED, SHALL HAVE OTHER REASON TO KNOW, OR IN FACT SHALL KNOW OF THE POSSIBILITY OF THE FOREGOING.

Using a batch reactor at Cal State Los Angeles, Dr. Elgammal succeeded in forming methanol in a single step. Scientists at Argonne National Laboratory conducted a second round of tests. Using a more sophisticated flow reactor, the Argonne scientists confirmed that the catalyst produced methanol in a single step. The Argonne testing "was a positive indication that this might be a commercially viable technology."[18]

---

[18] Tr. 110618, p. 5.

Claimants concede that the yield was small, put argue: "[O]ne thing is important to recognize and the evidence will show...that none of the tests that were done [were designed] to optimize the yield of the catalyst.  As of today, there's no evidence one way or the other of how-what the optimal yield of the catalyst is.  So those tests simply haven't been conducted. And those tests were going to be conducted as part of the next set of tests that Argonne wanted to pursue through this CRADA...."[19]  "[T]he tests that had been done were positive enough that Argonne wanted to move forward...."[20]  The testing did not move forward because Mr. Robinson refused to fund the CRADA.

Respondents failed to make payments of $856,886.  Because the Azod Parties "did everything they were required to do under the APA," they seek that sum plus interest, plus attorneys' fees, and the cost of the arbitration.[21]

## TESTIMONY OF THE WITNESSES

I will dispense with a chronological history of the transaction and discuss the facts through the testimony of the seven witnesses and the exhibits they discussed.  When making factual findings, I rely on the documents introduced into evidence, my notes of the testimony, and the rough draft of the hearing transcript.[22]

## DR. DEAN FANELLI, AUTHOR OF THE ASSET PURCHASE AGREEMENT

The Asset Purchase Agreement (dated October 15, 2014) governs the transaction, spelling out the rights and obligations of the parties.  The "APA" was drafted by Dr. Dean L.

---

[19] Tr. 110618, pp. 4-5.
[20] Id.
[21] Tr. 110618, p. 5.
[22] The parties ordered the rough draft but not a more polished version.  The rough draft, coupled with my notes, provides an accurate summary of the testimony.  From time to time, depending on the pace of the narrative, I will omit the titles, "Mr." and "Dr." and refer to individuals by their last names.

Fanelli, a Ph.D. chemist and sophisticated patent attorney.[23] Dr. Fanelli represented the

Robinson Parties.[24] Cecilia, LLC, a limited liability corporation owned and controlled by Mr.

Robinson, retained Dr. Fanelli to carry out three tasks: to write the APA, to file PCT' 111, and to

perform "due diligence" on the proposed technology acquisition.[25] Dr. Fanelli characterized his

due diligence assignment as "advising Mr. Robinson on whether the deal was kosher."[26] Dr.

Fanelli did not represent Novoform or any of the Claimants.

Dr. Fanelli is an important witness. When assessing the deal, Mr. Robinson did not rely

on his own limited knowledge of technology and patent law. Instead, he was aided by a person

skilled in these areas. Hence, Respondents' fraud and breach of contract claims must be

filtered through the prism of Dr. Fanelli. Facts known by Dr. Fanelli or disclosed to him (as

Robinson's agent) must be attributed to Mr. Robinson.

Mr. Robinson's in-house attorneys, Bayan Laird and Drew Wheeler are also significant

persons.[27] Although Laird and Wheeler lack a science or patent background, they were

attorneys for and agents of Mr. Robinson and Cecilia. Dr. Fanelli testified that he dealt with

Laird as Robinson's representative.[28] Laird and, later, Wheeler served as intermediaries

---

[23] Dr. Fanelli, is a partner at Seyfarth Shaw LLP. When he wrote the APA, he was Chair of Fanelli, Haag PLLC. Dr. Fanelli has an undergraduate degree in Chemistry from Villanova University, and a Ph.D. in Organic Chemistry from Temple University. Dr. Fanelli, who received his law degree from George Washington University, has been practicing patent law at a high level for 20 years.
[24] Dr. Fanelli is still representing Respondents in patent matters concerning PCT'111.
[25] Dr. Fanelli testified: "So that was what I was referring to, two hats. The one was assisting draft the application the other one was advising Mr. Robinson on whether the deal was kosher and all aspects of the asset which in this case was the application in line." Tr. 110818, pp. 52-53.
[26] Id. Dr. Fanelli still represents Cecilia. Cecilia has instructed him not to allow PCT '111 to become abandoned. Id., 109.
[27] Mr. Laird and Mr. Wheeler were, successively, in-house counsel for Morgan Creek, a company owned and controlled by Mr. Robinson.
[28] "I spoke with him [Laird]. I don't know him personally, but I know he was Mr. Robinson's representative that I spoke with on behalf of Cecilia." Id.

between Azod, on one hand, and both Fanelli and Robinson on the other.  According to

testimony that I credit, Laird told Azod that Robinson was hiring an attorney to perform due

diligence on his behalf.  Laird instructed Azod to send "things" to him and he would forward

them to the attorney.[29]

      Dr. Fanelli did not represent Claimants; nevertheless, he worked closely with Mr. Azod.

The two men spoke frequently and exchanged drafts of documents.  Dr. Fanelli communicated

directly with Dr. Elgammal "to some extent."[30] He communicated "fairly often" with Bayan

Laird.

      Dr. Fanelli testified that he understood the science and chemistry in PCT '111[31]   He fully

understood that the PCT '111 technology was designed to convert methane to methanol in a

single step using the catalysts described in the application.  According to Dr. Fanelli, Mr. Azod

and Dr. Elgammal were excited about the technology, which, if it panned out, was potentially

worth billions.[32]

      Dr. Fanelli characterized the APA, in which Mr. Robinson was investing $1million, as a

"low dollar deal."[33]  The degree of "due diligence" that is appropriate depends on the value of

the deal.  "This deal," he said, "was only a million dollars which is for the types of deals I

---

[29] "That someone turned out to be Dr. Fanelli, but at this time I didn't know that so at this time I was instructed to send things for Dr. Fanelli's review and that Bayan would forward these to Dr. Fanelli." Tr. 110618, 136-137.
[30] Tr. 110818, p. 63.
[31] "[T]hat application contains a specification which is a description of how the chemistry or science behind the technology works, particularly the conversion of methane to methanol using the catalysts and at the end of the document there's a set of claims which are the actual invention that describes either the catalyst per se or the methods that the inventor is claiming as what he is aiming to obtain." Tr. 110818, p. 32.

[32] "This was if it worked this is hundreds of millions if not billions of dollars of technology because of the fracking industry." Id., pp. 55-56.
[33] Tr. 110818, p. 37.

typically do [is] negligible with all due respect...."[34]  He appreciated that the technology was evolving and might not work out.[35]  Dr. Fanelli interpreted the "No Warranties" section of the APA as advising the purchaser that he was taking a risk.[36]  He understood that Mr. Azod was not representing that commercialization had already been achieved.[37]  I asked Dr. Fanelli whether Dr. Elgammal or Mr. Azod had discussed with him the prospects for developing the Novoform catalyst to a point where the yield would be a commercially viable, justifying building a plant. He responded that such a discussion would have been "premature" because commercialization depended on tests to be conducted at Argonne or perhaps "multiple labs after Argonne lab."[38] He testified:

> As I sit here I don't think I would have had that discussion because it probably would have been premature.  We were more focused on filing the application and just hypothetically oh, this is great stuff.  This really looks promising.  Let's take it into Argonne labs and see what we get there.[39]

> I asked Dr. Fanelli whether it was a "fair statement" that either at Argonne or a stage

beyond Argonne the catalyst's ability "could come crashing down and what looked promising or what looked worth doing would ultimately turn out to be a dud for lack of a better term."  Dr. Fanelli agreed; "That's a fair statement."[40]

---

[34] Tr. 110818, p.60.
[35] Id., p. 68.
[36] Id.
[37] Id., p. 72.
[38] Id., p. 89.
[39] Id.
[40] Id. During closing argument, I commented that Dr. Fanelli had characterized Novoform as "early stage technology."  Although Dr. Fanelli did not use those precise words, he considered the catalyst to be technology in a very early stage of development that might or might not work out.  Subsequent rounds of testing and development would be required to determine whether the technology would eventually bear commercial fruit.

Dr. Fanelli testified he was unaware of PCT '178 when he filed PCT '111. PCT' 178, he said, would have come to light had he performed a prior art search. He is virtually certain, however, that he did not perform such a search because the APA, a "low dollar deal", did not justify the expense.[41] He said that he relied on Dr. Elgammal, the inventor, and Mr. Azod, a patent attorney, to inform him of prior art within their purview.[42] Neither Dr. Elgammal nor Mr. Azod told him about PCT '178, however. In his view, there are similarities between PCT '111 and PCT '178 that would have caused him concern when he was drafting PCT '111. "So the title of the '178 application I was assisting Novoform in drafting was also directed to triazole catalysts. So this is related technology that I would have wanted to know about."[43] Had he known about 'PCT '178, he would have raised it with Mr. Robinson. Although Dr. Fanelli may have had concerns about PCT '178, he did not testify as an expert that '178 was material prior with respect to PCT '111.

If an applicant fails to disclose material prior art, Dr. Fanelli explained, two problems may ensue. First, the USPTO may declare an issued patent unenforceable due to inequitable conduct. Second, in a patent enforcement action a defendant may raise an affirmative defense of inequitable conduct based on failure to disclose material prior art.[44]

Dr. Fanelli also testified that neither Dr. Elgammal nor Mr. Azod provided him with test results that had been conducted on the Novoform catalyst before he filed the '111 application.[45] On direct examination, he was asked whether his judgment about the strength of

---

[41] Tr., 110818, pp. 36-40.
[42] Id., pp. 36-38.
[43] Id., p. 41.
[44] Id., pp. 44-46.
[45] Id., p. 46.

the application would have been affected had he known "there was no evidence that it [the catalyst] formed a sufficient quantity of methanol to make it potentially able to be commercialized."[46] He answered that if the catalyst "didn't work at all," he would have had a serious conversation with Azod and Elgammal.

I asked Dr. Fanelli about the utility requirement for obtaining a patent. He testified that the technology need not be capable of commercialization in order to be patentable. "It just has to work."[47] He agreed with the proposition that the utility prong is satisfied if the catalyst produces some quantity of methanol, however small.[48]

Dr. Fanelli was aware that efforts to convert methane to methanol in one step stretched back for decades. He understood that no one has successfully commercialized such a single step process. There are ways to do it, he said, "but it's high pressure, high temperature. It's not a simple process, so I don't believe there's a commercially easy way to do it...."[49]

Dr. Fanelli testified that he was wearing two hats: one hat as a patent attorney filing an application, and a second hat as an advisor to Mr. Robinson on "certain aspects" of the deal. Wearing his second hat, had he known that the test results were poor, in comparison to results achieved by previous catalysts, "I would have probably advised him let's wait for other results or even let's not do the deal."[50]

---

[46] Id., pp. 46-47.
[47] Id., pp. 48-50.
[48] Id., p. 49.
[49] Id. p. 50.
[50] Id., pp. 50-55. Dr. Fanelli also testified: "So if I knew that the test results were poor aside from the patent application I would have asked him what's the – why are you doing this deal? What's your exit strategy. How are we going to commercialize it?"

Dr. Fanelli was examined on a number of significant documents.  Claimants' Exhibit 728 is an email thread among Dr. Elgammal, Mr. Azod, and Mr. Laird in June of 2014, months before the APA was signed.  In an email of June 16, 2014, Laird advised Azod: "As for timing, Mr. Robinson is being advised that the D.C. patent attorney should do at least a very preliminary review of the draft patent, do a PTO search and perhaps speak with the scientist (which I think we can accomplish this week), before paying and/or depositing monies in escrow.  Mr. Robinson would like to get the draft patent to Dean in D.C. asap so please let me know if it's better for you to send it to me to forward, or if you should send it directly to Dean.  Thanks."

In response to this email, Mr. Azod wrote on June 16, 2014, "Hi Bayan, Here is the first draft of the patent application that Ramez (the inventor, whom I have copied on this email) drafted.  We are happy to speak with Dean at a mutually convenient time."  Laird replied on June 17, 2014, "Thanks, Armin.  Dean is reviewing all the pertinent documents.  I'll make an email introduction and/or set up a conference call when he's prepared to discuss.  Will keep you posted."  The same day, Azod responded, "Sounds good, Bayan."

When questioned on Exhibit 178, Dr. Fanelli testified that although the email says that he was retained to do a patent search, he did not, to the best of his recollection, perform one.

Dr. Fanelli was questioned on the No Warranties section of the APA.  He agreed the section means there is no guarantee of success and that the purchaser is buying the technology "as is." [51]

Dr. Fanelli was shown Claimants' Exhibit 518, an email thread from July – September 2014 among Mr. Laird, Dr. Fanelli, and Mr. Azod.  The men discussed different milestones for

---

[51]APA Section 9 (p. 5); Tr. 110818, pp. 68-69.

structuring payments.  Dr. Fanelli wrote on July 30, 2014, "[t]here are a lot of different ways to create milestones.  I think we should get on the phone and discuss what makes sense for both parties."  Dr. Fanelli provided examples.  In Example 2, payments would be made on the following milestone dates: "Execution of Asset Purchase Agreement," "Synthesis of prototype catalyst," "Pilot Scale Synthesis of Product," and "Execution of First License Agreement with a Partner."  These milestones make payments contingent on successful development of the catalyst on the uncertain road to commercialization. Fanelli agreed that Mr. Azod did not represent that a catalyst capable of successful commercialization had already been achieved.[52]

In the email thread, Mr. Azod wrote that he had received and forwarded to Bayan Laird a Statement of Work from Argonne National Lab.  Laird, therefore, was on notice that the catalyst would be subjected to further testing at Argonne after the APA was in place.

Dr. Fanelli testified he was unaware of facts to support a claim that Mr. Azod had failed to perform under the APA, or that Dr. Elgammal had failed to perform, or that Mr. Azod or other members of Novoform had committed fraud.   Aside from "our discussion earlier with regard to 178," he was not aware of any facts showing that Claimants had breached the APA. He is not aware of any acts or omissions by Claimants "that were wrong or dishonest."  When he needed help with drafting PCT '111, they provided it.  He considered Mr. Azod and Dr. Elgammal to be helpful and cooperative.  He considered Mr. Azod to be "very smart and he knew the technology."  He agreed that Argonne is a "recognized lab."[53]

---

[52] "Q. And that commercialization work is something that was contemplated work being done under the deal; right? A. Yes." Tr. 110818, p. 72.
[53] Id., pp. 73-77.

Dr. Fanelli was questioned about Claimants' Exhibit 192, an email thread from July 31, 2014 to August 5, 2014 among various individuals including Dr. Fanelli, Dr. Elgammal, Mr. Laird, and Mr. Azod.  In an email of August 4, 2014, Dr. Elgammal forwarded to Dr. Fanelli a set of documents that comprised the "experimental procedures" and described the "specific catalysts that were tested."  He ended his email with the following offer: "[p]lease let me know if you have any questions."[54]

Dr. Fanelli was asked about the transfer of technology under the APA.  "Q. To your knowledge, Mr. Azod provided all the protocols and provided a smooth knowledge transfer from Novoform to Cecilia; right?  A. Yes."[55]

Dr. Fanelli has not conducted an investigation to determine whether or not Mr. Robinson or Cecilia was induced by misrepresentations or omissions to enter into the APA[56]. 120.  He testified that the first time he was shown PCT '178 was at his deposition.[57]  He has not made a determination whether there was a predicate in the test data sufficient to support a claim that the technology was a potential blockbuster.[58]  Mr. Robinson has instructed him to let PCT '111 lapse.[59]

I asked Dr. Fanelli whether the "no warranties" clause of the APA meant (a) that there were no warranties with respect to the patent application or (b) whether there were no warranties with respect to the technology.  He answered, B.

---

[54] Claimants' Ex. 192 (Bates JGR000933)
[55] Tr. 110818, p. 75.
[56] Id., p. 120.
[57] Id., p. 117.
[58] Id., p. 122.
[59] Id.

**JAMES G. ROBINSON**

Mr. Robinson testified to his extraordinary rise, fueled by hard work, from paper boy living in a modest neighborhood to the head of a diversified business organization that, among other successes, produced famous motion pictures such as *Last of the Mohicans, Major League, Young Guns,* and *Ace Ventura.*   Mr. Robinson's friend, Peter Dekom, introduced him to Mr. Azod, who was looking for investors in a process that would save money for refineries.[60] He met Mr. Azod in March or April of 2014.  He and Azod "danced for five to seven or eight months" before Robinson decided to make an investment.[61]  Mr. Robinson recalled, "[t]hey had a product which they had developed and done all the testing or most of the major testing needed, and it just needed what I would call polish, meaning it needed to be [polished].  They needed some money.  I heard about Argonne, the government facility in Chicago."[62] Concerning Argonne, "[t]hey needed--they would need about--he said they needed about 11 or 12 grand for some test and maybe a few more thousand for some other tests but after that point the rest was going to be paid for by the US government and I got this spiel about the government wanted this country to be self-sufficient when it came to energy, i.e., all types of energy and this was a product clearly I knew methanol could be used as a fuel and the government would pick up the cost of whatever was needed to get this invention what I call ready to use, ready to start building a refinery and ready to start manufacturing."[63]  He did not

---

[60] Tr. 110918, p. 64.
[61] Id., p. 66.

[62] Id., p. 68.

[63] Id., p. 69.

anticipate that he would build a refinery.  Others would put up all of the money to build 12-15

refineries around the world, produce methanol, and give him a licensing fee.[64]

On direct, Mr. Robinson testified that before he signed the APA in October 2014, he was

not told that there were problems with the testing that had been done at Cal State Los Angeles,

or how many other efforts others had made over the decades to develop a one-step catalyst, or

that the data was insufficient to enable anyone to determine whether the Novoform catalyst

was capable of commercialization.  He thought that the catalyst development was "extremely

late" in the process, "and in fact it was the end and not the beginning."[65]  He was not told that

the investment was speculative.  Had he been told any of these things, he would not have done

the deal.[66]

He was not told that Dr. Elgammal had created another invention that was the subject

of the '178 application.[67]  He was shown Respondents' Ex. 496, an email in which Theodore

Krause of Argonne announced to Mr. Azod: "Good news! Magali [Dr. Magali Farrandon] ran a

number of the new catalysts and we finally observed methanol formation, albeit at low

concentrations.  But it is methanol!  I have attached a brief summary of the results."  Neither

Mr. Azod nor anyone else informed him at that time of these results or that the concentrations

of methanol were low.[68]

Mr. Robinson was shown the proposed CRADA dated June 11, 2015, in which Argonne

proposed additional testing and development work.  The third page of the document is a

---

[64] Id., p. 74.
[65] Id., pp. 75-77.
[66] Id.
[67] Id., p. 73.
[68] Id., pp. 84-85.

proposed budget that lists payments of $587.7K to be borne by the Robinson defendants for the work.[69]  Mr. Robinson's handwritten annotations, which were sent to Mr. Azod pointedly ask him to "Explain" why he is being asked to make these payments.  This came as a surprise to Robinson because, "I was never told I will have any costs except for 10 or 11,000 and one much smaller.  I was told the rest would be picked up by the US government.  Emphatically told."[70]

After seeing the proposed CRADA, he concluded that Mr. Azod and his colleagues had lied to him, and he decided that he would make no further payments.[71]

On cross, Mr. Robinson testified that he was represented by several attorneys in connection with the investment in Novoform.  These lawyers included Dr. Fanelli, Drew D. Wheeler, and Bayan Laird.  Brian Burra, a non-lawyer, was his assistant.  Mr. Robinson did not send or receive email.  His assistants would print out emails and submit them to him.[72]

**DR. JAY LABINGER**

Dr. Labinger was Mr. Robinson's third witness.[73]  He was retained as an expert on the technology embodied in PCT '111, which, in his opinion, is, and always was, worthless.[74]  The literature, he related, shows that over the decades single-step conversion of methane to methanol has been achieved using catalysts of different composition, including silica and various precious and non-precious metals.  The best conversion rates from these catalysts have

---

[69] The record is unclear whether the $587K total in the budget included the salaries of the Argonne scientists; these salaries apparently would be borne by Argonne, not Robinson.
[70] Tr. 110918, p. 88.
[71] Id., pp. 88-89.
[72] Id., p. 98.
[73] Dr. Labinger's testimony was consistent with his Expert Report, Respondents' Exhibit 1001.  Because of this, I will on occasion refer to his Expert Report.  I accepted Dr. Labinger as an expert in the field of Chemistry.  Dr. Labinger is not an engineer or chemical engineer, however.
[74] Tr. 110818, p. 191.

28

been in the range of 3% -5%.[75]  It is nothing new, he said, to develop a catalyst that produces a

low yield.  In his words, doing so is a "trivial accomplishment" that has been observed many

times over the years.  A single-step process with such a low yield cannot compete with the

established two-step process.  There is no evidence, he testified, that the Novoform catalyst

represents an improvement over prior catalyst.[76]

    In his opinion, the Novoform catalyst could never be commercialized.[77]  To begin with,

the best results achieved with the Novoform catalyst are more than a thousand times poorer

than the best results described in the literature.  There are no plausible grounds for expecting

any significant further improvement from the Novoform catalyst, no matter how much the

catalyst might be tweaked by Argonne or any other lab.[78]

    Dr. Labinger's Expert Report recites the first question he was asked: "In view of the

description of the 'Novoform catalyst' as defined in [PCT '111]...is there any basis on which to

reasonably expect that the Novoform catalyst would provide commercially viable yields?"  He

answered in the negative:

> Answer: In my opinion there is no such basis whatsoever.  This conclusion was reached
> as follows:  first, extensive prior literature shows that while direct conversion of
> methane to methanol can be and has been demonstrated with a large number of
> widely-varying catalysts, none of these has achieved yields greater than a few percent.
> Second, analysis based on the mechanism of these reactions strongly suggests that
> higher yields should not be expected, no matter what the catalyst.  Third, engineering

---

[75] Dr. Labinger was questioned extensively concerning Arno De Klerk's article in *Energy Science & Engineering* titled, *Engineering Evaluation of Direct Methane to Methanol Conversion.*  Respondents' Exhibit 1058.  This article was received by the periodical on 12 October 2014 and accepted for publication on 18 November 2014.  The article was, therefore, published after the APA was signed.

[76] Dr. Labinger testified that he saw no scientific sophistication in Claimants' team or in the Novoform catalyst.  Dr. Elgammal has little prior expertise in high temperature catalyst research.  Mr. Azod is admittedly not an expert. Dr. Zhang said that he was just acting as a pair of hands, doing what he was told to do.  Tr. 110818, pp. 202-203.

[77] Tr. 110818, p, 197.

[78] Tr. 110818, p. 197-199.

analyses have concluded that a direct methane conversion process based upon even the best results reported in the literature would be substantially less efficient than the existing indirect process, and hence could not be commercially viable. Fourth, the best results achieved with the Novoform catalyst are more than a thousand times poorer than those best literature results. Finally, there are no plausible grounds for expecting *any* significant further improvement – let alone the thousand-fold improvement that would be required even to match prior literature results (which themselves fall far short of viability) with the Novoform catalyst.[79]

Dr. Labinger criticized a drawing in PCT '111 that shows ligands present both before and after the calcination process. This is impossible, Dr. Labinger opined; anyone skilled in this art would know that the ligands would burn up in the calcination process.[80]

The Azod Parties, Dr. Labinger observed, claim that their use of ligands has a positive impact on the results of the catalyst. He dismisses this claim as nonsense: "[n]umber one they don't really have any idea how the ligands are arranged after they put them on so that they have no idea of knowing that [would] help organize the metals."[81]

He faulted PCT '111 for failing to disclose yield, selectivity, and conversion, factors that he described as "crucial" in evaluating the value of a catalyst. "A catalyst without any indication of how it performs is meaningless. It could be anywhere from a few thousandth of a percent which is the number we'll see when we look at the Argonne result to a very effective catalyst and I must say one of the things I was struck by when I first reviewed this was the absence of any data. There are no data whatsoever in terms of reactions. Just the bare statement yes, we

---

[79] Respondents' Exhibit 1001. In response to a second question, Dr. Labinger testified that 'PCT '178 discloses some catalysts that are claimed and described for some examples of the Novoform catalyst as defined in PCT"111.

[80] Respondents' Ex. 1080-57; Tr. 110818PD, p. 162. Dr. Labinger answered "Correct" to the following question that I asked him. "My understanding...was that the catalyst described in pages 1359 and 1360 could not be built as described in the diagram because the ligands would have burned up." Id., p. 166.
[81] Tr. 110818, p. 193.

saw methanol. That's very unusual. I don't remember ever seeing another patent application what did not contain such data." [82]

Dr. Labinger reviewed summaries of the Cal State LA testing results.[83] They describe the experimental set up for the gas chromatography and NMR tests.[84] From these descriptions, he said, one cannot determine the yield of the Novoform catalyst. The researchers were unable to obtain reliable results. "The one percent methanol sample looks the same size as the six percent methanol sample. "[85] In his understanding, the tests at Cal State LA were simply about determining whether or not any methanol at all was produced.[86] He considered the observation of methanol to be trivial because it had been done "a thousand times before."[87] Based on the Cal State LA testing, one cannot say whether the Novoform catalyst performed as well as or better than previous catalysts, and one cannot make any determination of the promise of commercialization, Dr. Labinger opined.[88]

He reviewed summaries of the Argonne National Laboratory testing.[89] In the March 2015 testing (Exhibit 2013), no methanol conversion was detected, either at low or high temperatures. In the July 2015 testing (Exhibit 1074), sixteen tubes were used. Catalysts were placed in fifteen tubes; one was left empty as a control. Some of the catalysts produced a very small amount of methanol, others produced none.[90] The highest concentration reported was

---

[82] Id., p.167.
[83] Respondents Exhibits 1006 and 1007.
[84] Tr. 110818, p.169.

[85] Id., p. 171.
[86] Id.
[87] Id.
[88] Id.
[89] Respondents' Exhibit 1013. The Argonne testing used a flow reactor. A flow reactor is more representative of a commercial process than is a batch reactor.
[90] Tr. 110818, p. 183.

.001, catalyst six. This translates to a yield of 1.5000 of a percent. He sees no precedent for improving the yield of this catalyst to match or better the 3 to 5 percent yield achieved by earlier catalysts. He does not think that an improvement of the Novoform catalyst to 3 to 5 percent would be possible.[91] Because some methanol was produced by the control tube (number 16), he could not say that the Novoform catalyst performed better than no catalyst at all.[92]

He deemed the Argonne test results unpromising. I asked Dr. Labinger why a reputable lab would encourage Novoform to continue testing and developing the catalyst: "[s]o the question is if it's so obvious that this catalyst is a nonstarter, why do we have Argonne not kissing the whole thing good by?" He responded that Argonne does not receive enough funding to keep its entire operation going and pay all the salaries. "So if someone is offering to bring in a project and pay for it, they will often accept it and that would be the driving force I would guess in this particular case."[93]

Finally, Dr. Labinger commented on Mr. Azod's claim that the Novoform catalyst was an improvement over prior art because, *inter alia,* it used no precious metals or harsh reagents. Dr. Labinger called this claim false, "[i]t's just not true."[94]

---

[91] Id., p. 186.
[92] Id., p. 187.
[93] Id., pp. 199-200.
[94] Id., pp. 203-204.

**CLAIMANTS' WITNESSES**

**DR. ANDREAS ROELOFS**

Dr. Roelofs is the Director of the Center for Integrated Nanotechnologies at Los Alamos National Laboratory.  Before Los Alamos, he was at Argonne National Laboratory from September 2011 to 2017, where his posts included Deputy Director, then Interim Director at the Center for Nanoscale Materials.  A national lab such as Argonne has multiple missions.  One is basic research that does not necessarily lead to commercialization.  If research can lead to commercialization, however, the lab will try to achieve a commercial impact.  Argonne is funded by the Department of Energy ("DOE"); one of its missions is to develop energy sources, especially clean energy.[95]

The annual budget for Argonne is $750 million.  While most of the budget is funded by the DOE, private industry contributes a small fraction.  A project of $400-$500K spread over several years would be insignificant from a budget standpoint.  He disputed Dr. Labinger's surmise that Argonne would be tempted to pursue a worthless project because the testing was supported by private dollars.  Due to the time and effort needed to put a joint research project in place, it makes no sense to pursue small dollar amount efforts, he said.  "What it takes to get these agreements into place to do the work for this small dollar amount is not what is the lab's interest.  It's in the science and then the commercialization making a difference.  That's it."[96]

Dr. Roelofs met Mr. Azod in the spring of 2014 at a conference.  Mr. Azod said that he had formed a start-up to pursue a new catalyst.  Dr. Roelofs responded that Argonne had the

---

[95] Tr. 110918, pp. 132-133.

[96] Tr. 110918, pp. 134-137.

33

sophistication, both in equipment and personnel, to help with testing and possible commercialization.[97]

Mr. Azod followed up.  On May 28, 2014, Argonne signed a Non-Disclosure Agreement with Novoform.  On July 28, 2014, Dr. Theodore ("Ted") Krause, the Theme Leader of the Catalysts Group at Argonne emailed Dr. Elgammal and Mr. Azod a draft Statement of Work and proposed budget for testing Novoform's catalysts.[98]  Mr. Azod forwarded the email thread to Bayan Laird.[99]  Thus, Mr. Robinson and his advisors received Argonne's proposal for first-round testing of the Novoform catalyst months before the APA was signed.

Mr. Azod and Dr. Zhang paid visited Argonne on December 7, 2014.  Elizabeth Jordan, Technology Manager at the Technology Development and Commercialization Division at Argonne prepared an agenda for the visit and forwarded it to Mr. Azod, Dr. Zhang, and a number of Argonne personnel.  Mr. Azod forwarded the agenda to Bayan Laird: "Hi Bayan, FYI and to share with Mr. Robinson."  During the visit, Dr. Roelofs introduced the Novoform executives to some of the Argonne personnel who would be involved with the project.  These included Dr. Krause, Carl L. Shurboff, a manager of Industry Partnerships, and Chris Claxon, who would explain the partnering mechanisms and contracting process.[100]

On December 18, 2014, Dr. Roelofs flew to Los Angeles to meet with Mr. Robinson and two of Robinson's lawyers, Bayan Laird and Drew Wheeler.  Dr. Roelofs recalled, "in general what was discussed at the meeting the whole idea of the meeting was to discuss how could

---

[97] Id., p. 139.
[98] Dr. Krause is a chemical engineer and a Ph.D.

[99] Claimants' Exhibit 32.
[100] Claimants' Exhibit 34.

Argonne help Novoform in developing and commercializing the catalysts faster."[101] Dr. Roelofs

described for Mr. Robinson the different contractual relations under which Argonne works with

others.  These include a User Facility, a Work For Others Agreement ("WFO Agreement"), and a

Collaborative Research and Development Agreement ("CRADA").

Under a User Facility, an outside scientist can access Argonne's facilities for free if the

scientist is willing to publish his or her data.[102]  Under a WFO Agreement, he explained, a

scientist may employ Argonne to perform work on a cost recovery basis, meaning that "all costs

incurred doing the research and the man hours have to be charged to the company that does

the research or we research for."[103] Under a CRADA, the outside scientist or company will own

any new idea or patent developed though the joint efforts the company and Argonne.  Unlike a

WFO Agreement, not all of Argonne's out-of-pocket costs must be borne by the outside

company.   In a proportion that depends on how the CRADA is written, Argonne will contribute

some of its own costs and effort.[104]  The CRADA is a joint effort, he explained, "[b]oth parties

have to contribute to it."[105]

Exhibit 533 is the WFO Agreement signed by Argonne and Mr. Robinson on behalf of

Novoform on February 3, 2015 and February 6, 2015 respectively.  Under this agreement, at an

estimated cost of $11,000, Argonne would evaluate Novoform's synthesis catalysts to

---

[101] Tr. 110918, p. 142.
[102] Id., p. 143.
[103] Id.
[104] Id., pp. 142-145.  Dr. Roelofs' testimony is seemingly inconsistent with his Declaration, which states (p. 4) that "under CRADA and Work for Others, the labs are required by the government to recover their full costs."   During the hearing, he was asked, "Q. And is the CRADA arrangement also a cost recovery set up? Bad word.  Is it a cost recovery agreement? A. Partially.  If it's a cooperation not all the costs are incurred by the participant.  Also, the lab puts in effort." Tr. 110918, p. 144.  He further explained that the participant would not necessarily be required to pay for all the time devoted by the Argonne scientists. Id., p. 145.
[105] Id., p. 145.

determine whether they produced methanol.[106]  The Statement of Work attached to the WFO Agreement as Exhibit A provides: "The Chemical Sciences and Engineering (CSE) Division of Argonne will conduct a series of experimental tests to evaluate the performance of eight (8) different proprietary catalyst formulations provided by Novoform, Inc. for the selective oxidation of methane to methanol."[107]

Dr. Roelofs testified that the Work for Others Agreement was designed to test one thing, whether the Novoform catalyst could produce methanol.  Dr. Roelofs recalled, "[d]uring the introduction and discussions with Dr. Zhang and Mr. Azod and Ted Krause and Magali we talked about what would be the first step that would convince us that its worthwhile to work on that and that was basically doing the first test if there's any conversion of methane to methanol."[108]  The last page of the Statement of Work for the WFO Agreement gave both Argonne and Novoform the right to stop the experimental run if favorable results were lacking.[109]  Dr. Roelofs testified that this provision, which was unusual in Argonne contracts, was inserted so that "each party can cancel in case we didn't see any conversion of methane to methanol we wouldn't want to waste our time on this."[110]

Dr. Krause and Dr. Magali Ferrandon carried out the tests under the WFO Agreement.  They found low temperature (200 degree C) methane to methanol conversion.  Exhibit 553 is an Argonne record that Dr. Ferrandon and Dr. Krause prepared; it is titled, "Partial Oxidation of Methane- 07/01/2015."

---

[106] Appendix A to the Work for Others Agreement.  Exhibit 533.
[107] Id.
[108] Tr. 110918, p. 147.
[109] "During the course of the experimental run, if the selectivity to CO2 exceeds 30% for all 8 catalysts we reserve the right to stop the experimental run after consulting with Novoform."
[110] Tr. 110918, p. 149.

Dr. Roelofs testified that based on these positive results, "the scientists [Dr. Ferrandon and Dr. Krause] were excited to move forward and the discussion was started on the second statement of work which would have been the CRADA."[111] Dr. Roelofs was asked whether he saw any promise of scaling up the catalyst. He responded affirmatively: "That was the idea of the CRADA to optimize the catalyst and then finally scale it up facility."[112] Exhibit 551 is a Statement of Work, which was Appendix A to the proposed CRADA. "The purpose of this effort is to develop and improve the Participant's existing technology to create at least one commercialization pathway for this technology. There is currently no commercial process that converts methane to its oxygenates. In practice, low conversion yield and selectivity has limited commercial viability. This effort will attempt to overcome these obstacles." Dr. Roelofs testified: "Basically here there's a catalyst that can convert methane to methanol if we can optimize that and get significant amounts of the material fabricated then we would be on the way to commercialization and that would then lead to impact."

Tr. 110918, p. 154.

The last page of Appendix A to the proposed CRADA (Exhibit 551) is a grid that estimates the "Contractor's Cost" as $587.7K spread over two years. Exhibit 556 is a Budget Justification prepared by Argonne. Dr. Roelofs' understanding is that this figure represents the cost of the project for both parties, Novoform and Argonne.[113]

Dr. Roelofs described the evaluation process required when a U.S. company wants to gain approval of work to be done at Argonne. A prerequisite is finding a scientist who is

---

[111] Id., p. 152.
[112] Id., p. 153.
[113] Tr. 110918, p. 160.

interested and willing to work on the project. Second, management must approve the project as consistent with Argonne's mission. Third, the Department of Energy must approve the CRADA.[114] According to Dr. Roelofs, "If the goal is commercialization and we wouldn't see hope for commercialization, we wouldn't do it."[115]

I asked Dr. Roelofs why Dr. Krause and Dr. Ferrandon thought the WFO testing results, which produced a very low volume of methanol, showed some promise or hope of commercialization. In response, he made two points. First, Dr. Krause and Dr. Ferrandon told him that predecessor catalysts used platinum, and expensive metal; the Novoform catalyst did not. Second, Dr. Krause and Dr. Ferrandon originally doubted that the Novoform catalyst would work at low temperatures.[116] "And when they saw there was conversion [at a low temperature], that gave them hope.[117]

**DR. RAMEZ ELGAMMAL**

Dr. Elgammal described the PCT '111 invention as a method to prepare new catalysts in a solid support tailored to transform methane to methanol. He conceived the idea by studying the academic literature, trying to identify gaps and also looking for inspiration in nature. Bacteria under mild conditions convert methane to methanol. Others before him had endeavored to develop a practical one-step catalyst. His invention differed from previous technology by assembling the materials together into a new type of catalyst structure.[118]

---

[114] Id., p. 162.
[115] Id., p. 163. Dr. Roelofs testified that the goal of the Novoform CRADA was commercialization.
[116] Both Krause and Ferrandon have Ph.Ds in Chemical Engineering. Dr. Krause runs the catalysis group at Argonne. Tr. 110918, p. 171.
[117] Id., p. 165.
[118] Tr. 110618, p. 26.

Dr. Elgammal identified Dean Fanelli was the patent attorney for PCT '111. Dr. Fanelli, he testified, determined the scope of the claims to include in the application. Dr. Elgammal's role was to prepare the specification and review the completed application. He provided Dr. Fanelli with protocols used to make and test the catalyst to date. He communicated with Dr. Fanelli by phone and email.

Dr. Elgammal testified that he spoke to Dr. Fanelli about prior art, including PCT '178. "I spoke about some academic papers as well as the patent application [PCT '178] I filed previously while I was at the University of Tennessee."[119] "Q. And I believe you testified about this earlier, but what discussions did you have with the patent attorney...Dean Fanelli about PCT 178 before closing of the APA? A. When PCT 111 was being drafted was the fact it existed and what distinguished the Novoform technologies from PCT 178."[120]

Dr. Elgammal described the testing at Cal State Los Angeles (sometimes "CSULA"). He used two types of analytical tools, nuclear magnetic resonance spectroscopy and gas chromatography.[121] He was shown Claimants'' Ex. 658, which he identified as a copy of the raw data from the catalyst testing at Cal State Los Angeles. Both tools confirmed the production of methanol.[122]

He was shown Claimants' Ex. 647, an email chain from July and August 2014 among himself, Dr. Fanelli, Bayan Laird, Armin Azod and Ute Splittgerber. On July 30, 2014, Fanelli

---

[119] Id., p. 27.

[120] Id., p. 66.
[121] Id., p. 31
[122] Id. The testing took place in the 2013, 2014 timeframe.

emailed an inquiry to Elgammal and Azod requesting the "specific steps of the synthesis of the

catalyst."

> We reviewed the PCT application and would like to add some additional matter to the specification to prevent competitors from making minor changes to the catalyst that may get around our claims. We would like to add some additional matter as well as add some exemplary examples. Do you have anything written that describes the specific steps of the synthesis of the catalyst. I know there are figures and a general description, but we are looking for something a bit more specific. For example, something like a materials/examples/results section that would be included in a journal article. We could use this to draft some broad examples as well as included specific examples as exemplary embodiments. I think this would add value to the application.

In response, Dr. Elgammal, on August 4, 2014, emailed Dr. Fanelli documentation he

described thus: "The attachment consisted of protocols to prepare the Novoform catalysts as

well as protocols that were used to test those catalysts in the Cal State University

laboratories."[123]   Claimants' Ex. 681 includes the protocols he sent to Fanelli. He described the

protocols as providing the following information:

> So first- so the first few headlines it was instructions on how to prepare some of the types of what I'll call ligands or you can think of them as the anchoring sites in the structure of the mesoporous silica or the catalyst substrate. Then how to react those ligands so that they're anchored to the substrate and then how to strategically place the metal centers on that substrate and then a process known as calcination which involves heating the material up to high temperatures under a gaseous atmosphere prepare the final activated catalyst and then the two types of characterization methods that were used to study whether or not the catalysts made methanol under those reaction conditions.[124]

Dr. Elgammal represented that in October 2014, when the APA was signed, "we

---

[123] Id., p. 33.
[124] Id., p. 35.

observed using both nuclear magnetic resonance spectroscopy and gas chromatography that methanol was indeed produced and so we knew that those catalysts under the reaction conditions that [we] were exploring did work."[125]

I asked Dr. Elgammal why his invention was an improvement over prior catalysts that produced methanol in small quantities. He responded that the structures themselves were unique: "the rationale was that these unique structures under the right reaction conditions could be improved over what previously existed. THE JUDGE: Improvement meaning capable of [gene]rating a greater volume of methanol? THE WITNESS: Correct."[126]

I asked further questions of Dr. Elgammal, who made the following points. It is not the process of creating methanol from methane in one step that is the invention. It is the construction of the catalyst that is unique. He thought Dr. Fanelli, a chemist, understood this. He believed Dr. Fanelli understood that the "secret sauce" was in the preparation of the catalyst and not in the fact of a one-step conversion. Dr. Fanelli understood that "the catalysts themselves were [in] their early stages of development."[127] At the time the APA was signed, what was needed was a testing facility that more closely mimicked an industrial type reactor. Their plan was to seek out appropriate facilities such as Argonne.[128]

Dr. Elgammal testified that he met with Mr. Robinson in May of 2014, after the testing at Cal State Los Angeles and several months before the APA was signed. He recalled telling Mr. Robinson that the catalyst was "early stage technology," that "there existed barriers towards

---

[125] Id., p. 37.
[126] Id.
[127] Id. pp. 38-41.
[128] Id., p. 43.

commercialization," and that "in order to assess commercial viability would require a significant investment and access to appropriate facilities to do the testing."[129]

Dr. Elgammal was asked why he was willing to sell Novoform and the catalyst technologies for a million dollars.  At that time, he explained, "it was still an early stage technology and if we were able to successfully commercialize it I had a royalty of 2 and a half percent that I was going to receive."[130]

Dr. Elgammal testified he told Mr. Robinson that more detailed studies "would have cost somewhere probably 3 to $5,000,000.[131]  When I pressed Dr. Elgammal on this point, he responded:  "The conversation was the latter.  So that 3 to $5,000,000 range was just an estimate of what it would take to confirm how the catalyst may operate in a commercial setting and to do a more expansive search of the scope of the best performing catalysts, their optimization and identifying the best conditions in which they operate."[132]

I then asked, "Was there any discussion with Mr. Robinson concerning whether or not that the catalyst may prove to be fool's gold and may go a-glimmering?"  He responded: "Certainly I highlighted that it was a risky process in that there were a lot of unknowns."[133]

Dr. Elgammal was familiar with the Argonne testing.  I asked whether the results were promising or not.  He responded that the tests indicated that methanol was formed, that the

---

[129] Id., pp. 45-46.

[130] Id., p. 50.
[131] Id., pp. 47 – 51.
[132] Id., p. 53.
[133] Id., p. 54.

amount formed was low, but there were conditions to be explored that might boost production.[134]

Asked a summary question, Dr. Elgammal stated that as of October 15, 2014, he was unaware of any information leading to the conclusion it would not be possible to commercialize the Novoform catalyst.[135]

On cross, Dr. Elgammal admitted that the Argonne testing showed "very low methanol concentration."[136] He also stated it was unlikely that the specific catalysts tested, under those conditions, could be commercialized.[137] The catalyst would have to be improved.

**DR. DONG ZHANG**

After receiving his Ph.D. in China, he did post-doctoral work at the University of Wyoming. He then moved to Cal State LA, where he is a part-time instructor in chemistry. In February 2012, he began work synthesizing the Novoform catalyst. He described the process, which took 18 months. The process took that long because there were mistakes in the protocol given to him by Mr. Azod. The next step, which began in mid-2013 was to test the catalyst at Cal State LA. He did so using a batch reactor, a nuclear magnetic resonance device, and a gas chromatography instrument.

Dr. Zhang identified Claimants' Ex. 681 as the protocol prepared by Dr. Elgammal, with his assistance, to synthesize the catalyst. He testified that the protocol is "very accurate" and

---

[134] Id., p. 59. "Certainly there were plans to examine other sets of reaction conditions, different temperatures, different procedures, different gas feeds so that we could pinpoint the optimal reactivity and optimal conditions in which those catalysts operated. So the long and short of it would have been more testing. Id., p. 68.
[135] Id., p. 69.
[136] Id., p. 84.
[137] Id., p. 85.

"include[s] all steps.[138]  He identified Claimants' Ex. 658 as "the nice NMR signal from June 2013 [detecting methanol] which we get from our catalyst after the reaction."[139]  Mr. Azod helped him with the tests as an extra set of hands.  Dr. Zhang was shown Exhibit 658, bates number 1103.  He testified that it displayed a methanol peak from a gas chromatography spectrum from January 2014.  The testing used controls to confirm that the positive results were due to the catalyst.

Dr. Zhang further addressed the two different methods used to test the catalyst at Cal State Los Angeles.  "So we successfully saw the methanol from out batch reactor, from our catalyst.  We use two different method to test.  One is NMR method which is very useful, very popular method to catalyze the organic compound.  Another method is gas chromatography. We also see the methanol produced from our batch reactor when we use our catalyst.[140]

Dr. Zhang continued to synthesize additional catalysts after the APA was signed, making 12 new batches and re-making old batches.  He made two trips to Argonne, one in late 2014, the other in 2015.  He spent a week at Argonne on each trip.  Argonne used a more sophisticated flow reactor.  Argonne personnel performed the tests for Novoform.  He himself was not allowed to touch anything at the facility.  Mr. Azod told him that the Argonne test was positive, demonstrating that the catalyst worked; it produced methanol.

He was willing to work on the catalyst after the APA was signed.  "Based on APA agreement, I need to continue to work on this project and try to scale up."  He only stopped

---

[138] Tr. 110718PD, p. 14
[139] Id., p. 15.
[140] Id., p. 28.

44

when his University told him there was no more funding to support him.[141]  Under the APA,

Cecilia, LLP was to pay him approximately $65,000 for one year of research work.  The payment

was to have been funneled through Cal State LA.[142]

When asked whether he knew the catalyst worked when he signed the APA, he

answered "Correct.  Our catalyst was working perfectly."[143]

On cross, Dr. Zhang testified that he did not research the existence of other single-step

methods for producing methanol.  He simply followed the protocol.

**ARMIN AZOD**

Mr. Azod testified that when the APA was signed on October 15, 2014, Novoform had

three assets:  PCT'111, the protocols, and the actual physical catalysts.  All three assets were

delivered to the purchaser in accordance with the APA.  He was instructed to take the physical

catalysts to Argonne, where they remain today.[144]  Dr. Elgammal emailed the protocol to Dr.

Fanelli as part of the latter's due diligence.  PCT '111 was assigned to Cecilia.  All of the

members of Novoform signed the APA.[145]

Mr. Azod testified that he emailed the Cal State LA test results to Bayan Laird on June 2,

2014, four months before the APA was signed.  Claimants' Exhibit 636 is an email of even date

from Azod to Laird.  The subject line reads, "GC and NMR spectra and Prof. Selke short

writeup."  The attachments to the email are Claimants' Ex. 658 (the NMR spectrum and the gas

---

[141] Id., p. 31.
[142] Id., p. 33.
[143] Id.
[144] Tr. 110618, p. 130.
[145] Id., 132.

45

chromatography test results from CSULA), and Claimants' Ex. 636 (one sheet titled, "New

Methanol Process-Experiments done at CLUSA")[146]

Azod was asked why he sent the three documents (the email and two attachments) to

Bayan Laird.  He responded, "I was told by Mr. Laird that Mr. Robinson was hiring someone to

do due diligence.  That someone turned out to be Dr. Fanelli but at this time I didn't know that

so at this time I was instructed to send things for Dr. Fanelli's review and that Bayan would

forward these to Dr. Fanelli.  So I sent him a short writeup and the test data as basically the first

set of documents to look at."[147]  Azod is familiar with the test results because he assisted Dr.

Zhang in performing the tests.[148]

When Mr. Azod signed the APA, he did not believe that PCT '178 was material to the

acquired assets.  PCT, 178 he said, deals with chemistry for unrelated catalysts that have not

gone through a calcination step.  Also, his understanding is that PCT '178 catalysts only work at

room temperature and only with peroxide.[149]  "It's different chemistry.  Works at room

temperature and pressure.  It's totally different chemistry."[150]  He did not consider the PCT '178

catalyst to be commercially viable.[151]

Mr. Azod testified that he informed Cecilia about the existence of PCT '178.  Claimants'

Exhibit 194 is an email of June 6, 2014 (more than three months before the APA was signed)

from Azod to Laird.  Azod forwarded to Laird an email from the University of Tennessee,

---

[146] Id., pp. 134-136.
[147] Id., p. 136.
[148] Dr. Zhang testified that confirmation of methanol could not be faked.  The machine operator simply pushed a button and the device read out a result.
[149] Tr. 110618, pp. 139-140.
[150] Id.
[151] Id., p. 142.

46

attached to which was an assignment from the University to Dr. Elgammal of PCT '178.  Mr. Azod wrote: "Here is a much earlier work by the inventor which the university assigned to the inventor.  Even though the currently attached document does NOT reflect Novoform's current catalyst, it still help[s] show a clear chain of title that EVERYTHING Ramez (inventor) owned with respect to catalyst has been assigned to Novoform.  Please call me with any questions."[152]

When asked why he sent the email and attachment to Laird, Azod testified: "Because I was told that Dr. Fanelli was doing due diligence.  This was another document that Dr. Fanelli should look at."[153]  According to Azod, Laird would collect documents and forward them to Fanelli.[154]  Claimant's Exhibit 15 is an email of June 6, 2014 from Laird to Azod acknowledging receipt of the assignment of rights.

Claimants' Ex. 728 is an email thread among Mr. Azod, Dr. Elgammal, and Mr. Laird from June 2014 that other witnesses discussed.  In the thread, Laird advised Azod that Robinson was being advised by a D.C. patent attorney, who would review the draft patent application, do a PTO search, and perhaps speak with Elgammal before Robinson made any payments.  As reflected in the thread, Azod sent Laird a first draft of the patent application and offered, "We are happy to speak with Dean at a mutually convenient time."  Laird responded, "Thanks Armin. Dean is reviewing all the pertinent documents.  I'll make an email introduction and/or set up a conference call when he is prepared to discuss.  Will keep you posted."  Azod understood, he testified, that Fanelli would be conducting a prior art search.[155]

---

[152] Id., p. 142.
[153] Id., p. 143
[154] Id.
[155] Id., p. 145.

47

According to Mr. Azod, he discussed PCT '178 during his "very first" phone conversation with Dr. Fanelli.[156] He and Laird sat in Laird's office, where they spoke by phone to Fanelli and Elgammal on a speaker phone.  Fanelli, Azod recalled, said that he was aware of PCT '178. [157] The group discussed PCT '178.  Mr. Azod understood that Dr. Fanelli has a Ph.D. in Organic Chemistry.

Azod was next questioned about Respondents' Ex. 1010, an email thread among Azod, Laird, and Fanelli from August 2014.  The thread ("Subject: Closing soon") began on August 12, 2014 with Azod's email to Laird and Fanelli. He wrote: "Soon as the PCT application is filed, we can get a copy to Argonne National Lab and Jacobs Engineering (both have executed NDAs) and we can sign the agreement and close."   Laird responded (to both Azod and Fanelli) in an email of August 20, 2014.[158]  He wrote that Mr. Robinson had raised a couple of "new issues/concerns that we should discuss."  One issue concerned the forecasted costs over the next 18 months and three years, which, in the draft business plan were $20million.  Laird wrote:

> Second-and perhaps more importantly-there is some confusion as to the forecast costs over the next 18 months and 3 years.  The draft business plan I have for Novoform (from Sept 2012) calls for - $20M; $10M over 18 months and $17M over 3 years.  I know these numbers are outdated in light of Argonne's government contract allowing them to do this at minimal cost (only materials?) but Mr. Robinson would like more detailed clarity on the estimated costs that will be required to bring this to market.

Azod responded in two emails of August 20, 2014 addressed to both Laird and Fanelli.  He wrote:

---

[156] Id., p. 146.
[157] Id., p. 147.
[158] Mr. Laird intended Dr. Fanelli to weigh in on the issues addressed in the email.  The text includes the following sentence: "Dean – do you know if there would be an advantage to Mr. Robinson/Cecilia by *not* acquiring Novoform but rather moving all the assets/IP into Cecilia and moving forward from there?"  Respondents' Ex. 1010, JRG000172.

On the cost estimates, Argonne's work statement gave a number of $10,000 [actually $11,000] and as you correctly state they are a cost recovery only facility. As the scale up progresses, I anticipate that Argonne may have to spend maybe as much as 10 to 20 to even 50 times that amount on data collection, but that is my internal number.

I know and have been told by Argonne that the scientific part of the research is free to us. That is, in part, why I have been so keen on filing the PCT, getting the application, and our protocols to Argonne immediately thereafter, and getting the science research (free to us) up and running.

That science data, is a massive cost leverage for Jacobs, and Argonne's scale up project as well.

As you man know, in my conversations with Jacobs they estimate that any new catalyst scale-up, may cost about $3 million to $4 million. However, our aim has been all along to get Argonne research (for free) and leverage that information to save on the Jacobs engineering costs.

Jacobs engineering costs would be, I am told, to create a single plant design solution, which Jacobs could then offer to sell to its clients (Shell, SABIC, Chevron, etc.) where we would receive royalty payments for our catalyst as integrated in the Jacobs' plant design.

With the Argonne data, available to us for free, and not duplicating the Jacobs' costs, the cost estimate for Jacobs is dramatically lower than the $3-$4 million, but at this point I don't know how much lower. It could be lower by a factor of ten.

Also, I have a bit more work on that front, to get exact specifications from Jacobs and have Argonne do the work, either the science for free part, or with their cost recovery part, and get that information back to Jacobs.....

I am happy to attend a conference call with you and Mr. Robinson to discuss further. Please let me know when that might be convenient.

The cost estimates that were in the business plan from 2012 came from estimates of building a pilot plant from scratch. That would be a pilot plant of several hundred tons of production per day.

My recommendations would be:

1. File the PCT application (assigned to Novoform)
2. Share the PCT as filed with Argonne and Jacobs
3. Close transaction

49

4. Get Argonne data to Jacobs and begin the process of integrated plant design for Jacobs to offer our catalyst as part of its solution to clients.

There are lots of contracts still to negotiate and draft, but many are standard contracts and there are existing industry standards that I can give more detailed information later as needed or desired.

During his testimony, Mr. Azod explained his understanding of Argonne as a cost-recovery facility. He said that Argonne, which is owned by the government, does not make a profit off the technology it develops. "But if they go out there and they have to buy a bucket to do something with it then basically I would have to pay Argonne for the cost of the bucket."[159] He also explained what he meant by his statements to Laird that, "I have been told by Argonne, that the scientific part of the research, is free to us." Azod responded that "Argonne was not going to charge a license fee or any other back end fee for the use of the science. The costs were whatever they spent out-of-pocket that they have to be reimbursed for it. But the use of the science wouldn't require separate licensing agreement."[160]

Mr. Azod testified that Mr. Robinson wanted to speak with someone from Argonne. Azod arranged for Dr. Roelofs to fly to Los Angeles to meet with Mr. Robinson on December 18. 2014.[161] Dr. Roelofs explained to Mr. Robinson the principles behind a Work for Others Agreement (the initial contract for an estimated $11,000) and a CRADA. Roelofs explained that if the initial testing was promising, and if Argonne wanted to continue the work, Argonne would draft a CRADA and attempt to scale up the catalyst.[162] Argonne, Dr. Roelofs advised Mr.

---

[159] Id., p. 150.
[160] Id., p. 151.
[161] Id., p. 152.
[162] Id., p. 161. According to Mr. Azod, Dr. Roelofs explained to Mr. Robinson that provisions in the WFO Agreement and in the CRADA would allow either side to walk away without penalty at any time for any reason. This provision, he explained, permitted both sides to terminate the CRADA if the scale up attempt looked unpromising.

Robinson, is a nonprofit entity, not looking to make a profit. But, Azod recalls Roelofs explaining to Mr. Robinson, Argonne's out-of-pocket expenses would be borne by Mr. Robinson.[163]

Mr. Azod estimated that from the time the APA was signed (October 15, 2014), through the end of October 2015, he spent a little less than half of his time, approximately 1,000 hours on Novoform.[164] When he signed the APA, he was unaware of any facts that might have a material adverse impact on Novoform's assets, he averred.[165]

Azod testified that he visited Argonne to meet with the scientists who would be working on the project. These included Dr. Krause, Dr. Farrendon, and Dr. Yougang Sun. He and Dr. Elgammal briefed the scientists on the Novoform catalyst and the testing at CLUSA. Azod testified that Under the CRADA, the salaries of the three Argonne scientists would be borne by Argonne not Cecilia.[166] The salary of Dr. Zhang would be borne by Cecilia.

Mr. Azod was questioned on Claimants' Exhibit 533, the Statement of Work section of the WFO Agreement that Mr. Robinson signed on February 6, 2015. Several provisions of the agreement are of particular interest. The Laboratory's "estimated cost" for the work to be performed was $11,000. The Sponsor (Novoform) was required to make an "Advance payment" of $11,000. The Laboratory would charge its costs against the advance payment. If the Laboratory's estimated costs to complete exceeded the advance payment, it could stop work until Novoform deposited more money. In other words, $11,000 was not a fixed price, but an estimate of Argonne's costs, and Novoform was responsible for those costs.[167] Article

---

[163] Tr. 110618, pp. 164-5.
[164] Id., pp. 156-157.
[165] Id., p. 161.
[166] Id., pp. 163-4.
[167] The Statement of Work (Appendix A to the WFO Agreement) explains the derivation of the $11,000 estimate. "In terms of effort and budget, the proposed budget is $11,000. The budget will cover 40 hours of effort for

XIX of the agreement gave either party the right to terminate at any time, and for any reason, upon giving 30 days' notice.

Dr. Krause was the author of the Statement of Work (Claimants' Ex. 533).[168] He wrote: "The Chemical Sciences and Engineering (CSE) division of Argonne will conduct a series of experimental tests to evaluate the performance of eight (8) different proprietary catalyst formations provided by Novoform, Inc. for the selective oxidation of methane to methanol."

Dr. Krause understood that the catalysts had been tested at CALUSA using a batch reactor. Because Argonne would be using a flow reactor, he wrote, "we would like to investigate [using Argonne's equipment] if the catalyst exhibits low temperature (50-200 degree C) [re]activity."[169]

Mr. Azod testified that the WFO agreement was designed to observe whether methanol formation could be detected. It was not designed to determine optimal yield or whether the catalyst could be scaled up commercially. Potential commercialization would be addressed in the CRADA.[170]

Azod testified that Argonne began testing in March of 2015. He kept Mr. Robinson informed through Drew Wheeler, in house counsel at Morgan Creek.[171] *See* Claimants Exhibits. 47, 479, and 496. The Argonne scientists observed methanol formation July 8, 2015. On that

---

setting up the experimental run including loading reactors and inputting the test conditions into the control software, analyzing the experimental data, and preparing the report. The budget also includes $1,000 for materials and supplies of which the major expense is the gases. The deliverable will be a report."
[168] Statement of Work, page 3, bates number 03380.
[169] Azod second day of testimony. Tr. 110718, pp. 61-63. In the Statement of Work (p, 4), Dr. Krause wrote: "[f]or each set of conditions, we will report methane and oxygen conversion, product yields, and selectivity on a carbon basis."
[170] Tr. 110718, pp. 63-64.
[171] Wheeler replaced Laird as Robinson's in-house counsel.

date, Dr. Krause sent Mr. Azod an email titled "Good news-we finally observed methanol!"[172]

Dr. Krause wrote: "Hi Armin, Good news!  Magali ran a number of the new catalysts and we finally observed methanol formation, albeit at low concentrations.  But it is methanol!  I have attached a brief summary of the results."

Azod forwarded Krause's email and results to Drew Wheeler and Bryan Burra (Burra was Mr. Robinson's assistant) with the following email message:  "The most pessimistic guy at Argonne [Dr. Krause], the guy who looked at me like I was crazy when I met him the 2 times I flew to Argonne today has written that his lab has shown conclusively that we can make methanol at 200C, in a flow reactor (flow reactor like all the industrial plants use to make methanol at 1100C).  The optimization work is engineering work that needs process engineers, but we hit a major scientific and technical milestone today.:)"

During his testimony, Mr. Azod acknowledged that the yields were "tiny," but the test, he said, was designed to determine methanol formation, not to optimize yield.  Optimization was the next step.  "As I mentioned earlier, Argonne was primarily concerned at this point to see whether methanol formation would be observed.  If there was methanol formation [then] they would look for the active sites.  Once they found the active sites they could optimize the active sites and they could optimize the distribution of the active sites."[173]

The next step would have been the CRADA.[174]  Claimants' Ex. 60 is the Statement of Work for the proposed CRADA.  Argonne, the author of the CRADA wrote: "The purpose of this

---

[172] Claimants" Exhibit 496.
[173] Tr. 110718, p. 75.
[174] Azod testified that Argonne drafted the proposed CRADA while WFO testing was underway.  If they observed no methanol, Argonne could walk away.  If they did observe methanol formation during the WFO stage, the CRADA could be signed quickly, avoiding lost time.  Tr. 110718, pp. 88-90.

effort is to develop and improve the Participant's existing technology to create at least one commercialization pathway for this technology.  There is currently no commercial process that converts methane to its oxygenates.  In practice, low conversion yield and selectivity has limited commercial viability.  This effort will attempt to overcome these obstacles."  The document listed the principal investigators for Argonne as Andreas Roelofs, Theodore Krause, Dean Miller, and Yugang Sun, and for Novoform as Ramez Elgammal and Dong Zhang.  The document included a preliminary budget of $587.7K.

According to Mr. Azod, the "largest component" of these costs would be Dr. Zhang's salary at Argonne and out-of-pocket expenses that Argonne might incur.[175]  Mr. Robinson refused to fund the CRADA.

On cross-examination, Mr. Azod disagreed with the proposition that when the WFO testing provided no scientific basis on which he could reasonably say that the catalyst could be commercialized.[176]  When asked what made the catalyst unique, Mr. Azod testified that it did not use precious metals, and it did not use caustic materials such as peroxide. It was a combination of attributes that made the catalyst unique, he said.[177]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

I will record my factual and legal findings by answering the seven (7) questions to be decided.  I will take the questions out of order.

---

[175] Id.
[176] Tr. 110718, p. 117.
[177] Id., pp. 140-143.

54

**Did Claimants materially breach Section 9(f) of the Asset Purchase Agreement by failing to disclose the existence of PCT '178 prior to the signing of the Asset Purchase Agreement?**

I find that Claimants did not fail to disclose the existence of PCT '178. Mr. Azod specifically advised Bayan Laird, Mr. Robinson's in-house attorney, of PCT '178 in an email of June 6, 2014 (Exhibit 194) more than three months before the APA was signed. Laird acknowledged receipt of the email. Because Mr. Laird was Mr. Robinson's attorney and agent, notice to Laird was notice to Robinson.

Respondents discount the notice to Laird, who lacked a background in patent law or technology, and would fail to appreciate the potential impact of the earlier application on PCT '111. I reject this argument for several reasons.

First, Mr. Robinson, an exceptionally busy man, did not communicate through email. Mr. Laird instructed Mr. Azod to send emails to him; he would pass the information to Mr. Robinson.[178] Mr. Azod was simply following instructions by communicating with Mr. Robinson through Mr. Laird.

Second, Laird advised Azod that Robinson had hired a patent attorney to perform due diligence and conduct a prior art search. Laird instructed Azod to communicate with the attorney (Dr. Fanelli) through him. Azod was simply following instructions. He quite reasonably assumed that Mr. Laird would forward the email and attachment to Dr. Fanelli.

Third, Azod had no motive to hide PCT '178. Having been told by Laird that the D.C. attorney would conduct a prior art search, Azod knew that such a search would quickly turn up PCT '178.

---

[178] Mr. Laird printed emails addressed to Mr. Robinson and gave him a hard copy.

Fourth, I credit Mr. Azod's testimony that he and Dr. Elgammal discussed PCT '178 with Dr. Fanelli during a conference call.[179] I am mindful of Dr. Fanelli's testimony that, to the best of his recollection, he saw PCT '178 for the first time when it was shown to him at his deposition. I do not believe to any degree that Dr. Fanelli was untruthful. A busy patent lawyer, Dr. Fanelli was testifying about the quotidian details of a minor business transaction that took place over four years ago. One can expect only so much from the human memory.

**Did Claimants materially breach Section 9(f) of the Asset Purchase Agreement by failing to disclose negative testing results of which they were aware prior to the signing of the contract?**

I find that Claimants did not breach Section 9(f) by failing to disclose negative test results. Mr. Azod emailed the Cal State LA test results to Mr. Laird on June 2, 2014, four months before the APA was signed. *See* Claimants' Exhibit 636. Attached to the email are the GC and NMR spectra results (Claimants' Ex. 658) as well as Dr. Selke's short description of the tests. (Claimants' Ex. 659).

Describing the catalyst, Dr. Selke wrote: "The catalyst itself is a new compound that [is] not commercially available and has not been previously prepared. It was prepared from commercially available materials at CSULA. We cannot disclose its structure or synthesis at this time. There are no precious metals involved." He described the experimental set-up: "[a]ll our experiments were done in a bench-top 200 ml stainless-steal [sic] high-pressure reactor with no flow." He described the GC analysis: "[g]iven our instrument's calibration, the methanol peak was observed between 28 and 32 minutes." He described the "[q]ualitative test for methanol

---

[179] I also credit Dr. Elgammal's testimony that he, the inventor on both applications, discussed PCT '178 with Dr. Fanelli.

by 1H NMR." He stated that "[a]ddition of authentic methanol increased the size of that peak, confirming that the peak was indeed methanol."

Respondents discount the notice to Laird, who lacked a science background. No one expected Laird to interpret the results himself, however. Laird served as a clearinghouse for Azod to communicate with both Mr. Robinson and Dr. Fanelli, the Ph.D. Chemist and patent attorney hired to perform "due diligence" on the deal.

Respondents contend that Claimants should have pointed out to Mr. Robinson the miniscule volume of methanol produced. There are several responses to this charge.

First, Claimants discharged their duty disclose the CSULA test results by producing the results themselves. Dr. Fanelli was capable of asking any follow-up questions that he deemed pertinent to the viability of the catalyst.

Third, the absence of test results in PCT '111 corroborates Mr. Azod's testimony that he was only claiming that the catalyst "worked" to produce methanol. Dr. Labinger adversely commented on PCT '111 for failing to include test results. He faulted the application for failing to disclose yield, selectivity, or conversion, factors that he described as "crucial" in evaluating the value of a catalyst. He recalled, "I was struck by when first reviewed this was the absence of any data. There are no data whatsoever in terms of reactions. Just the bare statement yes, we saw methanol. That's very unusual. I don't remember ever seeing another patent application that did not contain such data." *See* Tr. 110818, p. 167.

Dr. Fanelli, who filed PCT '111, appreciated that data were lacking and that the application claimed only the production of methanol. If data on yield were important, he could have asked for more information during the months that intervened between disclosure of the

CSULA test results and the signing of the APA.  That he did not do so reflects his understanding (attributable to Robinson) that Claimants were claiming only the production of methanol.  Dr. Fanelli understood that the catalyst was early stage, experimental technology, whose value could only be determined through further testing at Argonne and, perhaps, as he put it, labs beyond Argonne.

**Did Claimants materially breach Section 7 (Seller Deliveries at Closing) of the Asset Purchase Agreement by failing to deliver at closing "all assets owned by or controlled by Novoform Technologies, LLC", including protocols, testing results, and other trade secrets?**

Respondents' pressed this issue at the Rule 18 hearing, but it largely disappeared from the case by the time of the merits hearing.  I will cover it for the sake of completeness, ruling that Claimants did not breach Section 7 of the APA.

Mr. Azod testified that when the APA was signed on October 15, 2014, Novoform had three assets:  PCT'111, the protocols, and the actual physical catalysts.  All three assets were delivered to the purchaser in accordance with the APA, he said.  He was instructed to take the physical catalysts to Argonne, where they remain today.  Dr. Elgammal emailed the protocol to Dr. Fanelli as part of the latter's due diligence.  PCT '111 was assigned to Cecilia.  All of the members of Novoform signed the APA.

Claimants kept copies of the protocols and test results because the APA anticipated that some of them, particularly Dr. Zhang, would be working on the Argonne testing and commercialization efforts.  Respondents did not request that they relinquish this information and scrub their computers.  The APA obliged Claimants to keep the information confidential and to use it only for the benefit of Novoform and Cecilia.  There is no evidence that Claimants

misappropriated confidential information, which, in any event, Respondents contend has no value.[180]

**Did Claimants materially breach section 9(f) by failing to disclose or misrepresenting the anticipated cost of developing the Novoform catalyst?**

I find that Claimants did not breach section 9(f) by failing to disclose or by misrepresenting the costs of developing the catalyst.

Mr. Robinson testified that the budget appended to the proposed CRADA came as an unpleasant surprise. He had been told that Argonne needed between 11K to $12K for some tests, and maybe a few thousand more for other tests, but "after that point the rest was going to be paid by the US government." He testified: "the government would pick up the cost of whatever was needed to get this invention what I call ready to use, ready to start building a refinery and ready to start manufacturing." He did not anticipate that he would personally build a refinery (except, perhaps in China). Instead, others would put up the money to build 12-15 refineries around the world and give him a licensing fee.

Mr. Robinson has little in writing to support this claim beyond Respondents' Ex. 1010, an email thread among Azod, Laird, and Fanelli from August 2014, two months before the APA was signed. I have discussed this email chain in detail in connection with Mr. Azod's testimony. Mr. Laird began the discussion by stating that Argonne's draft business plan from September 2012 called for $20M over three years. Although Laird appreciated that these numbers were

---

[180] Mr. Robinson instructed Dr. Fanelli to allow PCT '111 to lapse.

outdated. "Mr. Robinson would like more detailed clarity on the estimated costs that will be required to bring this to market."

Azod's response to Laird (and Fanelli) conveys the clear understanding that he had little idea what the costs would be. No reasonable businessman could read Azod's vague email as a guarantee that Robinson's cost to bring the technology to market would be a few thousand dollars. A reader takes away two impressions. First, Robinson should be prepared to reimburse Argonne (a cost-recovery facility) for testing expenses in the range of $200K to $500K. Second, Robinson should be prepared to pay Jacobs Engineering between $3-$4 million for a demonstration plant if the Argonne tests proved favorable. [181]

Two other points are germane. First, Dr. Fanelli, who was conducting due diligence on the deal for Mr. Robinson, was copied on the email thread. The APA would not be signed for another two months. Dr. Fanelli, an attorney experienced in technology start-up deals, had the time and expertise to get a firmer grasp on the anticipated costs. [182]

Moreover, Mr. Robinson prudently asked to speak to someone from Argonne. I accept the testimony of Dr. Roelofs that he flew to Los on December 18, 2014 to meet with Mr. Robinson at his office. Dr. Roelofs testified that he explained WFOs and CRADAs to Mr. Robinson. He explained that under a CRADA, Mr. Robinson would be responsible for Argonne's out-of-pocket expenses. He also explained that Argonne, as a non-profit entity, would not seek to make a profit on the catalyst technology if it panned out.

---

[181] Azod testified to what he meant by the phrase, "the scientific part of the research is free to us." He said that Argonne, unlike universities, does not require private companies to take or grant a license of technology developed at Argonne. In other words, Argonne would not have ownership rights to the catalyst if it panned out.
[182] Argonne, for example, is owned by the Department of Energy. One can find out what is meant by Argonne's status a "cost recovery facility," and whether Argonne is willing to work for free.

Mr. Robinson signed the WFO agreement (Claimants' Ex. 533) on February 6, 2015, almost two months after he met with Dr. Roelofs. Significantly, the WFO is not a fixed price contract. As the work progressed, if the laboratory's estimated costs promised to exceed the $11,000 estimate, Argonne had the contractual right to stop work until Novoform deposited more money.

I find that Mr. Robinson and his advisors knew, or should have known, that the WFO testing, if successful, would be followed by a CRADA costing Mr. Robinson a sum in the general range of $200K-$500K. The CRADA proposed by Argonne was within that general estimate.

**Did Claimants fraudulently induce James G. Robinson to enter into the Asset Purchase Agreement?**

**Did Claimants fraudulently conceal a material fact from James G. Robinson, who, in justifiable reliance on the concealment, entered into the Asset Purchase Agreement?**

I find that Claimants are not guilty of fraudulent inducement or fraudulent concealment. The bar one must hurdle over to prove these torts is high. Both require proof by clear and convincing evidence. Both require reasonable or justifiable reliance by the victim. Both require intent to defraud or deceive. Fraudulent inducement requires a materially false representation, the falsity of which was either known to the defendant or made with reckless indifference to its truth. Fraudulent concealment requires failure to disclose a material fact with intent to defraud or deceive.

Respondents' proof must be measured against the fraud they allege. Mr. Robinson contends that he was promised a ground-breaking technology, a catalyst that was (i) capable of converting methane to methanol in a single step, and (ii) capable of being scaled up commercially. Beyond the purchase price, would be required to pay less than $20K for testing,

61

but "after that point the rest was going to be paid by the US government." "The government", he was promised, "would pick up the cost of whatever was needed to get this invention ready to use, ready to start building a refinery and ready to start manufacturing."

For the following reasons, I find that Respondents' proof of this fraudulent misrepresentation or concealment falls short.

First, there is nothing in writing that embodies these promises. Claimants clearly represented that the Novoform catalyst was capable of converting methane to methanol. In none of the many emails or other writings offered into evidence, however, do the Claimants ever promise that their catalyst was proven in the sense that it could be scaled up commercially. Even the overwrought prose of Claimants' Arbitration Demand claims only that the technology is "potentially revolutionary" and "could be" valued in the billions of dollars.

Second, Dr. Fanelli, hired by Mr. Robinson to assess the deal, did not share Mr. Robinson's view of the commercial readiness of the technology. He knew the technology might not pan out. He agreed with the proposition that the technology might turn out to be "a dud." He knew that commercialization depended on tests to be conducted at Argonne or perhaps "multiple labs after Argonne." Discussions about building a plant would have been "premature," he said, unless and until testing established the catalyst's commercial promise.

Third, Dr. Fanelli knew that efforts to convert methane to methanol had been underway for decades. He knew that, despite these efforts, no one had successfully commercialized a single step process. He had the same access to the prior art as did Claimants.

Fourth, Mr. Robinson understood that the "holy grail," single-step catalyst would potentially be worth hundreds of millions, if not billions of dollars. It was unreasonable for Mr. Robinson to believe that Claimants would sell him a scale-up ready catalyst for a million dollars.

Fifth, months before the APA was signed, Mr. Azod and Dr. Elgammal disclosed to Dr. Fanelli the protocols for producing the Novoform catalyst as well as the test results at CSULA. Dr. Fanelli testified that Azod Elgammal were helpful and cooperative and answered his questions about the technology. He did not that claim that any of the Claimants lied to him.

Sixth, I credit Mr. Azod's testimony concerning the objectives of the testing, as he understood those objectives and related them to Mr. Robinson and his advisors. He said the CSULA testing was designed to determine whether the Novoform catalyst could form methanol in a batch reactor. It did. He said the WFO Agreement with Argonne was designed to test whether the Novoform catalyst could produce methanol in a more sophisticated flow reactor. It did. He said the CRADA was the first testing phase designed to determine whether the catalyst was capable of commercialization. His testimony is supported by the written record. The proposed CRADA (Claimants' Ex. 60) states: "The purpose of this effort is to develop and improve the Participant's existing technology to create at least one commercialization pathway for this technology."

Seventh: Dr. Labinger, a distinguished chemist, opined that the Novoform catalyst was worthless and any effort to improve its performance to reach a commercial yield was doomed to failure. Argonne National Laboratory, a reputable government lab, did not share this bleak view, however. Dr. Roelofs, Dr. Krause, Dr. Ferrandon, and Dr. Sun all considered the WFO test results sufficiently promising to warrant exploring a commercial pathway through the CRADA.

Argonne and these scientists were willing to put their time and effort into the project, which might occupy them for two years. I reject the surmise these scientists were content to follow a blind alley because Mr. Robinson might fund the research. Argonne's willingness to pursue the CRADA demonstrates that the Novoform catalyst was not an objective fraud.

Eighth, Mr. Azod spent half of his time from October 2014 to October 2015 working on the Novoform technology. This time was uncompensated. His willingness to pour his own time and effort into the project gainsays fraudulent intent.

Ninth, in order for me to find fraud, I would have to find that Dr. Elgammal, Mr. Azod, Dr. Zhang, and Dr. Selke all conspired to hoodwink Mr. Robinson by peddling a technology they knew to be worthless. Nothing in the background of these individuals suggests that they would participate in a fraud, particularly a fraud that would be soon unmasked.

Tenth, one can debate the scope of the NO WARRANTIES clause of the APA, and whether it applies just to the patent rights or to the technology as well. Whatever its reach, the language conveys that the technology might not work, the purchaser is taking a risk, and purchasing the technology "as is."

For these and other reasons, I find against Respondents' on their two fraud claims.


**Is the APA a valid contract binding on Respondents?**

I find that the APA is a valid contract, unbreached by Claimants. As a result, I will award judgment in favor of Claimants against Cecilia, LLC in the amount stipulated by the parties on November 18, 2018. That amount totals $856,886. In a separate order, I will direct counsel to

submit a proposed form of order implementing this decision. *Inter alia.,* counsel shall address the appropriateness under Maryland law of awarding pre and post-judgment interest.

**Claimant's, as Prevailing Parties Seek an Award of Costs and Attorneys' Fees**

Section 21 (Dispute Resolution) of the APA provides: "The parties further agree that the arbitrator of any such dispute may, in the arbitrator's discretion, award money damages to the prevailing Party, including the costs of the arbitration and attorney's fees, as well as permanent injunctive relief."

**Cost of the Arbitration**

I hereby award the costs of the arbitration to Claimants. JAMS has calculated those costs as $130,802.02. In a separate order, I will schedule briefing and oral argument on the following issues: (i) the appropriateness under Maryland law of awarding post-judgment interest on the award, and (ii) whether the obligation should be imposed on Cecilia, LLC only or on Respondents jointly and severally.

**Attorneys' Fees**

I will issue an order scheduling oral argument by telephone conference call on the following issues: (i) the appropriateness of awarding attorneys' fees to Claimants, (ii) whether to award to Claimants the costs of the arbitration apart from payments to JAMS, and (iii) whether any award should be imposed on Cecilia, LLC only or on Respondents jointly and severally.

The above is hereby **SO ORDERED this 7th day of February 2019.**

*Benson Everett Legg*
Judge Benson Everett Legg (ret.)

65

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Azod, Armin, et al. vs. Robinson, James G., et al.
Reference No. 1415013632

I, Teresa Menendez, not a party to the within action, hereby declare that on February 7, 2019, I served the attached Partial Final Award (Corrected at Pg. 64) on the parties in the within action by Email and by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Washington, DISTRICT OF COLUMBIA, addressed as follows:

Alan S. Gutman Esq.
John F. Juenger Esq.
Gutman Law
433 N. Camden Dr.
Suite 900
Beverly Hills, CA  90210
Phone: 310-550-7460
alangutman@gutmanlaw.com
jjuenger@gutmanlaw.com
  Parties Represented:
  Cecelia, LLC
  Good Stuff, LLC
  James G. Robinson
  Morgan Creek Productions, Inc

Alfredo P. Perez de Alejo Esq.
Steffin, Azod LLP
1801 Century Park East
24th Floor
Los Angeles, CA  90067
Phone: 310-980-5781
alfredo@steffinazod.com
  Parties Represented:
  Armin Azod
  Dr. Dong Zhang
  Dr. Ramez Elgammal
  Dr. Shantanu Sharma
  Peter John

Armin Azod Esq.
David M. Arbogast Esq.
Amanda Fleming Esq.
Steffin, Azod LLP
1801 Century Park East
24th Floor
Los Angeles, CA  90067
Phone: 310-737-8529
armin.azod@usaiplaw.com
david@usaiplaw.com
amanda@usaiplaw.com
  Parties Represented:
  Armin Azod
  Dr. Dong Zhang
  Dr. Ramez Elgammal
  Dr. Shantanu Sharma
  Peter John

Mr. Aaron Perez-Daple
Justin Heather Esq.
Steffin, Azod LLP
1801 Century Park East
24th Floor
Los Angeles, CA  90067
Phone: 312-675-6150
aaron@steffinazod.com
justin@usaiplaw.com
  Parties Represented:
  Armin Azod
  Dr. Dong Zhang
  Dr. Ramez Elgammal
  Dr. Shantanu Sharma
  Peter John

Patricia L. Glaser Esq.
Steven P. Basileo Esq.
Justin Thiele Esq.
Glaser Weil Fink, et al.
10250 Constellation Blvd.
19th Floor
Los Angeles, CA   90067
Phone: 310-553-3000
pglaser@glaserweil.com
sbasileo@glaserweil.com
jthiele@glaserweil.com
   Parties Represented:
   Cecelia, LLC
   Good Stuff, LLC
   James G. Robinson
   Morgan Creek Productions, Inc

Fred D. Heather Esq.
Glaser Weil Fink, et al.
10250 Constellation Blvd.
19th Floor
Los Angeles, CA   90067
Phone: 310-553-3000
fheather@glaserweil.com
   Parties Represented:
   Cecelia, LLC
   Good Stuff, LLC
   James G. Robinson
   Morgan Creek Productions, Inc

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington,

DISTRICT OF COLUMBIA on  February 7, 2019.

Teresa Menendez
tmenendez@jamsadr.com